# UNITED STATES v. SOUTHERN UTE TRIBE OR BAND OF INDIANS

No. 515.   Argued March 1, 1971—Decided April 26, 1971

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 174.

*Lawrence G. Wallace* argued the cause for the United States.   On the briefs were *Solicitor General Griswold, Assistant Attorney General Kashiwa, Peter L. Strauss,* and *Edmund B. Clark.*

*Glen A. Wilkinson* argued the cause for respondent. With him on the brief was *Richard A. Baenen.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In 1951 the Southern Ute Tribe or Band of Indians, a part of the Confederated Bands of Utes, brought this claim before the Indian Claims Commission.[1]   The claim asserted that the United States had violated its fiduciary duty to respondent by (1) disposing of 220,000 acres of land as "free homesteads" although obligated by 21 Stat.

---

[1] The claim was filed pursuant to the Indian Claims Commission Act, 25 U. S. C. § 70a.   See also 25 U. S. C. § 70k.

203–204 (1880) and 28 Stat. 678 (1895) to sell the acreage for the respondent's benefit; and (2) by failing to account for the proceeds of 82,000 acres of land, which proceeds were, under the same Acts, to be held for the respondent's benefit. The Government's basic defense was *res judicata* by reason of Court of Claims consent judgments entered in 1950 between the United States and the Confederated Bands of Utes, including the respondent.[2] *Confederated Bands of Ute Indians* v. *United States,* 117 Ct. Cl. 433 (1950). The Indian Claims Commission rejected the defense, 17 Ind. Cl. Comm. 28 (1966); but the Court of Claims, in an unpublished order, App. 57–58, remanded for the taking of additional evidence. On remand the Commission again rejected the defense, 21 Ind. Cl. Comm. 268 (1969), and the Court of Claims affirmed, two judges dissenting. 191 Ct. Cl. 1, 423 F. 2d 346 (1970). We granted certiorari. 400 U. S. 915 (1970). We reverse.

The consent judgment entered in the Court of Claims gave effect to a settlement agreement which recited a stipulation of the parties that:

> "[A] judgment . . . shall be entered in this cause as full settlement and payment for the complete extinguishment of plaintiffs' right, title, interest, estate, claims and demands of whatsoever nature in and to the land and property in western Colorado *ceded by plaintiffs to defendant by the Act of June 15, 1880* (21 Stat. 199), which (a) the United States sold

---

[2] The 1950 cases were brought under the Jurisdictional Act of 1938, 52 Stat. 1209. The settlement reduced to consent judgment principally relied upon by the Government is that in Case No. 46640, 117 Ct. Cl. 433, 436 (1950). Related stipulations are reported at 117 Ct. Cl., at 434, 438, 440. The aggregate amount of the settlements exceeded $31 million. The United States also unsuccessfully asserted below defenses of failure to state a claim and failure to join all necessary parties. Those questions are not before us.

for cash . . . (b) disposed of as free homesteads . . . and (c) set aside for public purposes [between 1910 and 1938]. . . . There is filed herewith and made a part of this stipulation Schedule 1, which contains the legal descriptions of [lands] . . . disposed of by defendant as free homesteads and the remaining . . . acres . . . set aside by the defendant for public purposes. . . . However, the judgment to be entered in this case is *res judicata,* not only as to the land described in Schedule 1, but . . . also *as to any land* formerly owned or claimed by the plaintiffs in western Colorado, *ceded to defendant by the Act of June 15, 1880 . . . .*" 117 Ct. Cl., at 436–437 (emphasis added).

The lands involved in the present suit were not included in Schedule 1; rather, the Government relies upon the clause that the consent judgment was *"res judicata . . .* also as to any land . . . ceded to defendant by the Act of June 15, 1880 . . . ."

Both the Indian Claims Commission and the Court of Claims rejected the Government's *res judicata* defense on the ground that the claim concerning the lands involved in this action was not compromised by the 1950 settlement because those lands were not among the lands "ceded to defendant by the Act of June 15, 1880."

Decision of this case turns, then, upon the proper interpretation of the agreement, embodied in the Act of 1880, between the United States and the Ute Indians as it relates to the settlement agreement, reduced to judgment in 1950, between the same parties. The determination of that interpretation requires a somewhat lengthy factual recitation.

In the latter half of the 19th century, what is now the Confederated Bands of Utes, composed of the Uncompahgre Utes, the White River Utes, and the Southern

Utes, exchanged their aboriginal lands in New Mexico, Utah, and Colorado for a reservation of approximately 15.7 million acres lying wholly within Colorado. 13 Stat. 673 (1864); 15 Stat. 619 (1868). Although the acreage was undivided, the White River Utes lived in the northern portion of the reservation, the Uncompahgre Utes inhabited the central part, and the Southern Utes occupied the southern region. The reservation, however, survived little longer than a decade in this form. In 1874 the Utes approved the Brunot Cession of 3.7 million acres of the east-central portion of the reservation after valuable mineral deposits had been discovered there. 18 Stat. 36 (1874).[3] The result of the cession was almost to sever the reservation, leaving the Southern Utes wedged between the southern boundary line of the Brunot Cession and the New Mexico border, at the southernmost part of the reservation on a strip of land 15 miles wide and 110 miles long. This strip, which includes the lands at issue here, is referred to by the parties as Royce Area 617, and the remainder of the reservation after the Brunot Cession is referred to as Royce Area 616.[4]

Within eight years, only the Southern Utes remained in Colorado: the White River Utes and the Uncompahgre Utes departed for Utah before 1882 as a consequence of the massacre in 1879 of Indian Agent Meeker and others at White River station. The public outcry over this incident led to negotiations with the Confederated Bands which produced the Act of 1880.

---

[3] The United States admits that the stated consideration was not promptly paid. Brief for Petitioner 5. See also J. Dunn, Massacres of the Mountains 583–587 (1958).

[4] These derive from a map of Indian land cessions, Pl. CXVI, drawn by Charles Royce in connection with a published study, Indian Land Cessions, 18th Ann. Rep., Bur. of Amer. Ethnology, pt. 2 (1896–1897).

The central feature of the Act of 1880 was the termination of tribal ownership in the reservation lands, and the limitation of Indian ownership to such lands as might be allotted in severalty to individual Indians. The purposes of that provision were to destroy the tribal structure and to change the nomadic ways of the Utes by forcibly converting them from a pastoral to an agricultural people. See 10 Cong. Rec. 2059, 2066 (1880). The Act recited that it was enacted to accept "the agreement submitted by the confederated bands of Ute Indians in Colorado, for the sale of their reservation in said State . . . ." 21 Stat. 199 (1880). Thus, it was provided that the Confederated Bands "cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement." 21 Stat. 200 (1880). The settlement provisions stipulated that the White River Utes would leave Colorado "and settle upon agricultural lands on the Uintah Reservation in Utah," *ibid.*, and that "[t]he Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado," *ibid.*, or if insufficient agricultural land was found there, go to Utah (which they soon did). The Southern Utes were to "remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado; and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other unoccupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico." *Ibid.* Finally, it was provided that "all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United

States and subject to disposal," but only for the financial benefit of the Utes. 21 Stat. 203–204 (1880).

The plain wording of the Act cedes to the United States all of the nonallotted acreage of the reservation, including that in the 15-mile strip (Royce Area 617) occupied by the Southern Utes. The Court of Claims' opinion acknowledges this, stating that:

> "The most significant aspects to be gleaned from this [1880] Act . . . is that the Confederated Bands (Southern Utes included) seemed to cede their *entire* Colorado reservation—Royce Area 616 *and* 617—and moreover promised to accept allotments in severalty in various sectors within and beyond reservation boundaries. As sole consideration for these promises, the Bands were to receive shares in the proceeds of unallotted land sales remaining after certain Government reimbursements. The Southern Utes were apportioned a one-third share and like their confederates understood that such monies would be held by defendant in trust for their benefit." 191 Ct. Cl., at 10, 423 F. 2d, at 350 (1970) (emphasis in original).

Thus, if inquiry were to end with the wording of the 1880 Act, the consent judgment barred respondent's claim.

The Commission and the Court of Claims did not, however, end their inquiry with the wording of the Act of 1880. Both of those tribunals considered the conduct of the United States in relation to respondent tribe in the years subsequent to passage of the Act of 1880. Even so, the basis of their rejection of the *res judicata* defense does not emerge from their opinions with complete clarity. The Court of Claims read the Commission's first opinion, 17 Ind. Cl. Comm. 28 (1966), as holding that the Southern Utes expressly withheld the southern strip from the lands ceded by the 1880 Act: "The Commission found that the Act of 1880 'reserved' Royce Area 617 for the Southern

Utes." 191 Ct. Cl., at 10, 423 F. 2d, at 350. Some language at that point of the opinion suggested that the Court of Claims was in agreement with that view—"the following sequence of events . . . support the conclusion that plaintiffs at any rate did not cede their reservation (Royce Area 617) under the agreement of 1880." *Ibid.* However, the opinion later turns the decision on a different theory:

> "The more tenable theory, in our estimation, is that Congress recognized that by its protracted acquiescence in the Southern Ute occupation, Government rights to the land had somehow lapsed, or the agreement not being executed for so long a time, was rescinded and dead. It may be that the obligation to deal justly and honorably with the Indian wards did not allow insistence on full implementation of the apparent terms of the 1880 agreement. On the other hand, the Southern Utes obviously did not see themselves as mere squatters. The Congress therefore decided that if the land was going to be acquired free and clear new consideration was necessary. Hence we find section 5 of the 1895 agreement to be an explicit waiver of the Government's rights created in the 1880 agreement, whatever they were. It follows then that the Southern Ute lands in controversy were ceded in 1895 not 1880." *Id.,* at 19–20, 423 F. 2d, at 356.

This reasoning implies that the holding that the lands in suit were not ceded in 1880 rests upon application of the doctrines of estoppel, or waiver, or a compound of those doctrines. We disagree that the history relied on supports any of those bases for decision, even assuming (and we have serious doubts) that the plain words of the Act of 1880 can thus be varied to except the lands in suit from the phrase "any land . . . ceded" in the consent

judgment. We turn, then, seriatim to the events relied upon below.

Even before 1880 the Southern Utes had experienced hardship in living on the southern strip. Essentially, they were a pastoral people and the strip was so narrow that it was difficult to keep their animals within it. In addition, the white population to the north and south of the strip was increasing and the resulting lines of commerce cut across the strip.

> "The Indian Bureau, realizing that this strip, by reason of its narrowness and of its remoteness from the other portion of the reservation, was entirely unsuited to the use of the Indians, suggested that negotiations be entered into with them for the cession of that strip. In accordance with this, in 1878, Congress passed an act authorizing such negotiations (U. S. Stat. L., vol. 20, p. 48), and under this authority a commission . . . was appointed, and during the same year they negotiated an agreement with the Indians whereby they agreed to exchange this strip for another reservation." S. Rep. No. 279, 53d Cong., 2d Sess., 1 (1894).

But before the bill was acted upon by Congress, the Meeker Massacre occurred.[5] The outcry following that incident caused Congress to adopt the solution in the Act of 1880 affecting all of the Ute tribes. Contrary to the apparent view of the Commission and Court of Claims, this segment of history does not show an inten-

---

[5] While apparently the "massacre" involved only the White River Utes, all Utes were blamed. See exchange of correspondence during the uprising among the Indian agents, Secretary of the Interior, Governor of Colorado, and others printed in S. Exec. Doc. No. 31, 46th Cong., 2d Sess. (1880). See also J. Dunn, Massacres of the Mountains (1958), and U. S. Army, Military Division of the Missouri (Gen. P. Sheridan, Commanding), Record of Engagements with Hostile Indians 88–91 (1882).

tion to treat the Southern Utes differently from the other Utes; rather, it demonstrates a congressional decision to treat the Southern Utes as the White River and Uncompahgre Utes were being treated, save that the White River Utes were being completely banished from Colorado.

The Act of 1880 provided that "a commission shall be sent to superintend the removal and settlement of the Utes, and to see that they are well provided with agricultural and pastoral lands sufficient for their future support . . . ." 21 Stat. 201 (1880). The Commission visited the Southern Utes to carry out that mandate and in 1881 its chairman reported to Congress:

> "During my stay on the reservation I took occasion . . . to talk to the leading men . . . on the subject of their location in severalty. In these conversations I called their attention to the fact that the work the surveyors were doing was the preliminary step to such location [in severalty] . . . . I did not find one who desired a house, or would agree to dwell in one if built for him on his own land. It will take time and careful management to induce these Indians to abandon their present [way of living] and adopt the new mode of life contemplated by the agreement.
>
> "In the mean time, and while the change is going on, they must be protected from annoyance. . . . To prevent intrusion and guarantee proper order and protection, I can see no other way than to so modify the [1880] agreement . . . as to maintain the exterior lines of the strip of land one hundred miles long and fifteen wide, and preserve all the land within these lines for an indefinite period as an Indian reservation . . . . Then the land selected, and upon which the Indians are to be located, can be kept free

from intruders." H. R. Exec. Doc. No. 1, pt. 5, Vol. 2, 47th Cong., 1st Sess., 393 (1882).

But Congress did not create the recommended reservation. Instead, Congress took action consistent with adherence to the plan of the Act of 1880. There had been great pressure to open Royce Areas 616 and 617 to homesteading after the Act of 1880 had resulted in the removal of the Uncompahgre and White River Utes. The Southern Utes were, however, still occupying the southern strip, Royce Area 617. The apparent result was the Act of July 28, 1882, 22 Stat. 178, which declared that all of the northern portions of the reservation formerly occupied by the Uncompahgre and White River Utes, Royce Area 616, were now public lands to be disposed of for the benefit of the Utes in accordance with the Act of 1880. Section 2 of that statute provided that the Secretary of the Interior "shall, at the earliest practicable day, ascertain and establish the line between" the two Royce Areas. 22 Stat. 178 (1882). We find nothing in the legislative history of that statute to support a finding that it evidenced a congressional conclusion that the southern strip had not been ceded by the Act of 1880. On the contrary, the thrust of the legislative history is that the line was drawn to assure that there would be no interference with the land in Royce Area 617 available for allotment to the Southern Utes under the Act of 1880. H. R. Rep. No. 799, 53d Cong., 2d Sess., 2 (1894); S. Rep. No. 279, 53d Cong., 2d Sess., 2, 3–4 (1894).[6]

---

[6] The Court of Claims found proof that "the Interior Department at least was already viewing the Southern Ute territory as a permanent reservation not ceded under the terms of the 1880 cession," 191 Ct. Cl., at 13, 423 F. 2d, at 352, in a description of the line in an 1882 letter to the district land offices. We find nothing in the letter to that effect, and in any event, it could hardly be the basis for disregarding the congressionally expressed design.

The Court of Claims also found support for its conclusion in what was said to a congressional committee by a Ute spokesman for the Southern Utes at a meeting in the District of Columbia in 1886. The spokesman stated that the delegation had come "to see if we cannot exchange our reservation for another. . . . The present reservation is narrow and long, and we want to go west and see if we can't sell it." S. Rep. No. 836, 49th Cong., 1st Sess., 1 (1886). The Court of Claims viewed this as demonstrating that "the Southern Utes were still in possession of their part of their old reservation under claim of right." 191 Ct. Cl., at 14, 423 F. 2d, at 353. We do not doubt that the Southern Utes regarded the lands they occupied as "our reservation," but we fail to see how this nullifies the conveyance of the strip made by the Act of 1880. On the contrary, there is cogent evidence that the United States totally rejected the Indians' claim that the strip was "our reservation." After two bills to effectuate the removal of the Southern Utes failed to pass, Congress enacted 25 Stat. 133 (1888) empowering "[t]he Secretary of the Interior . . . to appoint a commission . . . with authority to negotiate with the band of Ute Indians of southern Colorado for such modification of their treaty and other rights, and such exchange of their reservation, as may be deemed desirable by said Indians and the Secretary of the Interior . . . ." *Ibid.* Despite the reference to "their reservation," the premise of this statute was obviously that amelioration of the plight of the Southern Utes would require "modification of their treaty and other rights" as they had been fixed in the Act of 1880. Even the Court of Claims thought the Act of 1888 little support for the respondents' contention:

> "Although the language of this act tends to favor plaintiffs' position it is by no means conclusive. It

merely authorized the establishment of a commission to engage the Southern Utes in negotiations for the purpose of persuading them to do belatedly what the Uncompahgre and White River Utes had done some years earlier, namely, to vacate their reservation and move elsewhere. A reasonable explanation for the act's exclusive terms is that the Southern Utes were the only band of the confederation as to whom the 1880 agreement was still executory." 191 Ct. Cl., at 15, 423 F. 2d, at 353–354.

The Commission formed pursuant to the Act of 1888 did succeed in negotiating an agreement with the Southern Utes, under which the Southern Utes would have been moved to a reservation in San Juan County, Utah. The Court of Claims observed that in such case "[p]resumably, their evacuated reservation lands would then be sold in accordance with the Act of 1880 and the proceeds would be held for the collective benefit of the Confederated Bands in the prescribed proportions, that is, the consideration visualized in the 1880 agreement as accruing to the Southern Utes would still accrue." 191 Ct. Cl., at 16, 423 F. 2d, at 354. In other words, the treatment of the Southern Utes would be precisely that accorded the Uncompahgre and White River Utes when they left Colorado. But this event only serves to furnish still more proof that the Government remained firm in its position that the strip was ceded by the Act of 1880.

This is confirmed by the congressional reaction when the agreement was submitted for approval—nothing happened for six years and the agreement was again introduced in 1894. The opinion of the Court of Claims depicts the situation:

"Conceding the 'anomalous position [of the Southern Utes] of having ceded their reservation and yet remaining on it', the Senate Committee on Indian Affairs favored ratification (Sen. Rep. No. 279, 53d

Cong., 2d Sess. 2–3 (1894)). Its House counterpart, although concurring in the view that the Southern Utes presented an anomalous situation, did not assent to ratification (H. R. Rep. No. 799, 53d Cong., 2d Sess. 2–3 (1894)). It believed that the proposed reservation was too large for the Southern Utes and hence would encourage their nomadic ways. Therefore, instead, the House Committee recommended enactment of a pending bill which was eventually passed as the Act of February 20, 1895 (28 Stat. 677). The stated purpose of this Act was to annul the agreement of 1888 and enforce the treaty of 1880 which sought to settle the Indians in severalty." 191 Ct. Cl., at 16, 423 F. 2d, at 354.

This recital refutes, rather than supports, the notion that the United States followed a pattern or course of conduct after 1880 that regarded the Southern Utes rather than the United States as the owners of Royce Area 617.

Finally, we cannot agree with the Court of Claims that § 5 of the Act of 1895 is "an explicit waiver of the Government's rights created in the 1880 agreement, whatever they were." 191 Ct. Cl., at 19–20, 423 F. 2d, at 356. The Act of 1895, in addition to annulling the 1888 agreement, expressly confirmed the Act of 1880 and directed the Secretary of the Interior to proceed with allotments in severalty to the Southern Utes "in accordance with the provisions of the Act of [1880]." 28 Stat. 677 (1895). It went on to settle the grievances of those Southern Utes who wanted their own reservation rather than allotments in severalty by providing that "there shall be . . . set apart and reserved all that portion of their present reservation lying west of" a defined line in the strip. *Id.,* at 678. We do not see how the United States could have "set apart and reserved" a portion of the strip for a reservation unless the strip belonged to it. The remainder of the strip to the east of the new reservation

was to be available for allotments in severalty to individual Southern Utes and the land not allotted was to "be and become a part of the public domain" to be sold for the benefit of said Utes. *Ibid.* Section 5 allocated the proceeds from sales of the land opened to public settlement. We look in vain for anything in that section to support the conclusion of the Court of Claims that it contains an "explicit waiver" by the United States of its rights under the Act of 1880 and that "[i]t follows then that the Southern Ute lands in controversy were ceded in 1895 not 1880." 191 Ct. Cl., at 20, 423 F. 2d, at 356. The Senate Report recommending passage of the Act of 1895 belies that conclusion. The report repeats, once again, the previously stated position of the Congress that "[o]n March 6, 1880, [the Utes] . . . ceded the whole of their reservation in Colorado to the United States, except such lands, if any, as might be allotted to them in severalty." S. Rep. No. 279, *supra,* at 2. We discern nothing in § 5 save some revision of the formula for allocation of the proceeds of the sales of the unallotted lands in the portion of the strip east of the reservation.[7] We find ab-

---

[7] Section 5 of the Act of 1895 provides in pertinent part:

"That out of the moneys first realized from the sale of said lands so opened up to public settlement there shall be paid to said Indians the sum of fifty thousand dollars, as follows: Five thousand dollars annually for ten years . . . to be equally divided among all of said Indians per capita, irrespective of age or sex; also the sum of twenty thousand dollars of said proceeds shall be paid to the Secretary of the Interior, who shall invest the same in sheep and divide the said sheep among the said Indians per capita equally, irrespective of age or sex; [certain allotments also made to specific chiefs and headmen] . . . that the balance of the money realized from the sale of lands, after deducting expenses of sale and survey, shall be held in the Treasury of the United States in trust for the sole use and benefit of said Southern Ute Indians. That nothing herein provided shall in any manner be construed to change or interfere with the rights of said Indians under any other existing treaty regarding any annuities or trust funds or the interest thereon." 28 Stat. 678 (1895).

solutely no language that the Southern Utes made any cession thereby, and, indeed, we are convinced that the wording is consistent only with the fact that they had no land to cede.[8]  The Act of 1895 simply resolved the impasse over the allotments in severalty which had existed for 15 years because of the Southern Utes' reluctance to accept them.  The United States created a new reservation for them, while still permitting allotments to those Southern Utes willing and qualified to engage in farming.  This plan was clearly constructed in reliance

_____

[8] The Court of Claims also seems to have placed some reliance upon the following words in an order of the Acting Secretary of the Interior in 1938 which restored to the Southern Utes that portion of Royce Area 617 yet undisposed of:

"[P]ursuant to the provisions of the Act of February 20, 1895 (28 Stat. L., 677), the Southern Ute Band of Indians in Colorado ceded to the United States a large area of their reservation in the State of Colorado established expressly for their benefit under the treaty of June 15, 1880 (21 Stat. L., 199)," S. Doc. No. 194, 76th Cong., 3d Sess., 659 (1941) (compiled by C. Kappler).

The Court of Claims suggested that these words demonstrated that "[petitioner's] officials . . . not only concede that the lands were ceded in 1895, but they also enlighten us as to the status it retrospectively applied to the 1880 agreement." 191 Ct. Cl., at 20, 423 F. 2d, at 356.

As we have said in this opinion, we find no creation of a reservation for the Southern Utes in the Act of 1880, nor can we find any words of cession in the Act of 1895. In addition, rather than attaching the significance suggested by the Court of Claims, the quoted words are more properly to be treated as careless draftsmanship: the time of cession, whether 1880 or 1895, was of absolutely no consequence to the act of restoration of undisposed lands in 1938. Finally, the quoted words do not support the application here of the principle that courts should give weight to a consistent reading of an ambiguous document by the agency charged with its enforcement. As our opinion shows, we do not find either the Act of 1880 or that of 1895 ambiguous. Moreover, what consistency the parties have shown in the enforcement of those acts, cuts against the contention of the respondent.

upon, not in derogation of, the cession made under the Act of 1880.

We therefore hold that the claim in this case is *res judicata* under the 1950 consent judgment enforcing the settlement agreement "as to any land . . . ceded to defendant by the Act of June 15, 1880." [9]

*Reversed.*

MR. JUSTICE DOUGLAS, dissenting.

Though the facts of this case are complex, they present but one major question, whether the lands in question were "ceded to defendant by the Act of June 15, 1880," and included in a consent judgment entered by the Court of Claims in 1950.

More precisely, what was the status of these lands (Royce Area 617) between 1880 and 1895? Were they ceded in 1880, yet not released by the Indians until 1895? How can it be said that Royce Area 617 was ceded in 1880 yet retained until 1895, since, as the Court of Claims stated, "the Southern Utes were allowed to remain on their surveyed reservation for 15 years after the purported cession, and the right to remove them without their further consent was not asserted or exercised." 191 Ct. Cl. 1, 19, 423 F. 2d 346, 356.

---

[9] The Court of Claims' unreported order remanded the case to the Commission "for the hearing of additional evidence and the making of findings of fact with respect to the intention of the parties to the stipulation upon which a final judgment was entered in Court of Claims Case No. 46640 (117 Ct. Cl. 436) on July 13, 1950." App. 57. The Commission's supplemental findings after the hearing on remand are reported in 21 Ind. Cl. Comm. 268. We question the propriety of the remand, see *Delaware Indians* v. *Cherokee Nation*, 193 U. S. 127, 140–141 (1904); *United States* v. *William Cramp & Sons Ship & Engine Building Co.*, 206 U. S. 118, 128 (1907), but do not decide the question since it does not appear that the decision of the Court of Claims turned on any evidence of the intention of the parties to the stipulation.

Twice the facts have been considered, once by the Indian Claims Commission and once by the Court of Claims. And both have resolved the question presented in favor of the respondent, Southern Utes. That result below is amply supported by the record.

As of 1880, the Confederated Bands of Ute Indians occupied a reservation of 12,000,000 acres in western Colorado. The White River Utes and the Uncompahgre Utes occupied the northern portion (Royce Area 616), and the Southern Utes occupied an almost separated southern section (Royce Area 617). In 1880, the Utes entered into a treaty with the United States. It provided that the chiefs would persuade their people

"to cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement.

"The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado; and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other unoccupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico." Act of June 15, 1880, 21 Stat. 200.

The cession of the territory was on the express condition:

"That the Government of the United States cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty . . . ." *Id.*, at 200–201.

The Secretary of the Interior was authorized to have the land surveyed for allotment. Commissioners were to make the allotments,

"and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands

of the Ute Indians, and this acceptance by the United States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States . . . ." *Id.,* at 203.

The Ute Commission was formed. In 1881 it reported to Congress. The Uncompahgre and White River Utes had been moved, but the Southern Utes were still on their reservation. The Chairman of the Commission had decided that it would be unwise to move them.[1] The allotments, a condition of the cession, were not made. In 1882, Congress declared Royce Area 616 to be public land (22 Stat. 178). It provided that a line be established between Royce Area 616 and Royce Area 617. § 2. The Secretary of the Interior ordered the line to be drawn "[c]ommencing *at* the southwest corner of the Ute *ceded* lands; thence extending the south *boundary*

---

[1] It has been suggested that the Indians refused to take the allotments or were stalling. This appears inconsistent with the report of Mr. Manypenny, the Chairman of the Ute Commission. The white settlers were dissatisfied on learning that the Indians might be allowed to settle in certain valleys which the settlers desired. The allotment, and sale of the residue to whites, would leave the Indians in "close proximity to the white settlements [and] will subject the Utes . . . to constant annoyance by evil-disposed persons." The Indians had to be protected from this.

"To prevent intrusion and guarantee proper order and protection, I can see no other way than to so modify the [1880] agreement, so far as these Indians are concerned, as to maintain the exterior lines of the strip of land one hundred miles long and fifteen wide, and preserve all the land within these lines for an indefinite period as an Indian reservation, and let the United States laws in relation to Indian reservations have full force therein. Then the land selected, and upon which the Indians are to be located, can be kept free from intruders." (H. R. Exec. Doc. No. 1, pt. 5, Vol. 2, 47th Cong., 1st Sess., 383, 393 (1881)). He did indicate that the Indians did not want to live in houses, but not that they would not accept the allotments.

of the Ute *ceded* lands to the western boundary of the State of Colorado." [2] (Emphasis supplied.)

As of this time it appears that neither the Southern Utes nor officials of the United States thought that Royce Area 617 had been ceded by the Act of 1880. The Southern Utes still considered it their reservation [3] and the Commissioner of Indian Affairs apparently felt likewise [4]—all of which is inconsistent with the theory that there had been a cession of it in 1880.

In 1888, Congress authorized the Secretary of the Interior to appoint a commission to negotiate with the Southern Utes. They agreed to settle in Utah, but Congress would not approve the agreement. Congress then passed the Act of 1895, 28 Stat. 677:

"That within six months after the passage of this Act the Secretary of the Interior shall cause allotment of land, in severalty, to be made to such of the Southern Ute Indians in Colorado as may elect and be considered by him qualified to take the same out

[2] "From this description it would seem that the Interior Department at least was already viewing the Southern Ute territory as a permanent reservation not ceded under the terms of the 1880 cession. Specifically, the letter states that the survey line commence *at,* not *in,* the southwest corner of the ceded Ute land. Adhering to defendant's contention that *all* lands were ceded in 1880, a literal interpretation of this letter would lead to an anomalous result. If the starting point was placed *at* the southwestern corner of Ute ceded land, the point would coincide with the converging point of the New Mexico, Colorado and Utah borders. The line could not extend to the western boundary of Colorado because it would start there." 191 Ct. Cl., at 13, 423 F. 2d, at 352.

[3] The Southern Utes came to Washington in 1886 to negotiate for an exchange of their reservation for one to the west. See S. Rep. No. 836, 49th Cong., 1st Sess., 1–2 (1886).

[4] On April 5, 1886, he reported to the Secretary of the Interior, "[W]e are bound by solemn treaty stipulations with these Indians to prevent white people from entering upon or crossing said reservation." *Id.,* at 3.

of the agricultural lands embraced in *their present reservation* in Colorado, such allotments to be made in accordance with the provisions of the Act of [1880] . . . and the amendments thereto . . . ." § 2.

"That at the expiration of six months from the passage of this Act the President . . . shall issue his proclamation declaring the lands embraced within *the present reservation* of said Indians except such portions as may have been allotted or reserved under the provisions of the preceding sections of *this Act,* open to occupancy and settlement." § 4, 28 Stat. 678. (Emphasis supplied.)

The money realized from the sale of the lands set aside was to be held for the sole benefit of the Southern Ute Indians. Section 6 declared that the provisions of the Act were not to take effect until accepted by a majority of the male adult Indians. A majority did accept.

Some of the Southern Utes took allotments in severalty. The Weeminuche Utes, now the Ute Mountain Utes, elected, however, to settle on a tract at the west end of their "present reservation." § 3.

A substantial amount of land in Royce Area 617 was settled by whites, and disposed of by the United States Government. The subject of the present suit before the Indian Claims Commission includes, *inter alia,* the proceeds from land sold and damages for land given away in violation of the Act of 1895.

In 1934, Congress allowed restoration of all land in Royce Area 617 not disposed of under the Act of 1895. (48 Stat. 984.) The Secretary of the Interior restored all such land to the tribal sovereignty of the Southern Utes. That order began:

"[P]ursuant to the provisions of the Act of February 20, *1895* . . . the Southern Ute Band of Indians in Colorado *ceded* to the United States a large area of

their reservation in the State of Colorado *established expressly for their benefit under the treaty of June 15, 1880 . . . ."* (Order of Restoration, September 14, 1938, S. Doc. No. 194, 76th Cong., 3d Sess., 659 (1941) (compiled by C. Kappler).) (Emphasis supplied.)

The Confederated Bands have sued the United States in the past for damages arising out of breaches of the 1880 treaty. One such suit was settled in 1950, and judgment was entered pursuant to a stipulation of the parties. A schedule of all land covered by the judgment was included, but omissions were provided for:

"So far as the parties with diligence have been able to determine these descriptions represent all the land so disposed of and set aside. However, the judgment to be entered in this case is *res judicata,* not only as to the land described in Schedule 1, but, whether included therein or not, also as to any land formerly owned or claimed by the plaintiffs in western Colorado, ceded to defendant by the Act of June 15, 1880 . . . ." 117 Ct. Cl. 433, 437.

None of the land in Royce Area 617 (360 sections or 21.8% of the total area which had been wrongly disposed of) was therefore included.

The Indian Claims Commission found that the United States had acknowledged by its actions that the Southern Ute Reservation was not ceded by the 1880 Agreement. Therefore, any accounting which included Southern Ute lands in Case No. 30360, 45 Ct. Cl. 440 (1910), was erroneous and beyond the jurisdiction of the Court of Claims to enter. The Court of Claims remanded this case to the Commission for a determination of the intention of the parties in entering into the 1950 stipulation. Plaintiffs produced evidence that they never intended Royce Area 617 to be covered. The broad language of the stipulation was to insure that minor omissions were covered.

"Diligence" would not have permitted the exclusion of 360 sections of land. The Government refused to produce any documents which might have disclosed the intent of its signatories, claiming this was the "work product." The Commission found no intent to include land in Royce Area 617 in the stipulation.

The Court of Claims found that the language of the Act of 1880 *appeared* to be inconsistent with the findings of the Commission, but that the events from 1880 to 1895 supported its conclusion, *i. e.,* the decision to postpone issuing allotments and to preserve the reservation, the separation of Royce Area 617 by the Act of 1882, the description of the dividing line by the Secretary of the Interior, the negotiations with the Southern Utes to move, the belief by the Commissioner of Indian Affairs of a duty to keep white people off the "reservation," [5] the Act of 1888, and the Act of 1895 providing additional compensation for the Southern Utes [6] and requiring their approval.[7] The evidence weighed "substantially in favor of the Commission's interpretation." The Government's conduct, the Court of Claims said, evidenced a recognition that "by its protracted acquiescence in the Southern Ute occupation, Government rights to the land had somehow lapsed, or the agreement not being executed for so long a time, was rescinded and dead." 191 Ct. Cl., at 19, 423 F. 2d, at 356.

"Hence we find section 5 of the 1895 agreement to be an explicit waiver of the Government's rights

[5] N. 4, *supra.*

[6] The treaty of 1880 required that the proceeds from sales of *all* land ceded under that agreement had to be credited to the benefit of all Utes. To credit the money received only to the account of Southern Utes would have been a violation of the treaty if the land had been ceded in 1880.

[7] If the land had been ceded under the 1880 agreement, acceptance of the Act of 1895 was completely unnecessary.

created in the 1880 agreement, whatever they were. It follows then that the Southern Ute lands in controversy were ceded in 1895 not 1880." 191 Ct. Cl., at 19–20, 423 F. 2d, at 356.

This holding was supported also by the language employed by the Secretary of the Interior in the Restoration of 1938.[8]

Since the Southern Ute land was not ceded in 1880, any claims involving that land were beyond the mandate of the Jurisdictional Act of 1909, 35 Stat. 781, and improvidently heard in 1910. Likewise the 1950 judgment was no bar. Neither party had intended it to apply to Royce Area 617. If the intention of the parties was irrelevant, the stipulation on its face would not apply to "areas not *effectively* ceded." 191 Ct. Cl., at 22, 423 F. 2d, at 358.

This Court now reviews those findings and reverses. In doing so it simply remarshals the evidence for the new result, ignoring the limits of this Court's appellate jurisdiction over the Court of Claims. The question present is either a question of fact or, at best, a mixed question of law and fact and the determination of the Court of Claims is binding on this Court if it is supported by *substantial* evidence. *United States* v. *Swift & Co.*, 270 U. S. 124, 138; *United States* v. *Omaha Tribe of Indians*, 253 U. S. 275, 281. The result below is clearly supported. It is not the function of this Court to conduct a trial *de novo* on the issues. *United States* v. *Felin & Co.*, 334 U. S. 624, 650 (Jackson, J., dissenting); *United States* v. *Penn Mfg. Co.*, 337 U. S. 198, 207 n. 4.

I would affirm the judgment of the Court of Claims.

---

[8] "Thus, defendant's officials do not only concede that the lands were ceded in 1895, but they also enlighten us as to the status it retrospectively applied to the 1880 agreement. Such a statement by an executive agency bearing on the meaning of a treaty must be accorded great weight." 191 Ct. Cl., at 20, 423 F. 2d, at 356.