**USM CORPORATION, Plaintiff,**

v.

**STANDARD PRESSED STEEL CO., Defendant.**

**No. 74 C 1514.**

United States District Court,
N. D. Illinois, E. D.

June 12, 1978.

James P. Hume, Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Jerry Hosier, Hosier & Niro, Ltd., Chicago, Ill., for plaintiff.

John A. Mitchell, Leonard J. Santisi, and Curtis, Morris & Safford, New York, N. Y., Donald L. Welsh, Fitch, Even, Tabin, Leudeka, Chicago, Ill., for defendant.

### ORDER

BUA, District Judge.

This is an action brought by a patent licensee seeking, among other relief, a declaration of the invalidity, and its non-infringement, of the underlying patent. The parties have both been involved for many years in the manufacture of patch-type self-locking threaded fasteners.[1] Defendant Standard Pressed Steel (SPS) is the

---

1. Such a fastener is, in simple terms, a bolt with a patch of nylon or nylon composition material affixed to the threaded surface. When the bolt is threaded into its counterpart member the compression of the nylon causes it to resist loosening which might otherwise result from vibration or movement.

assignee of a 1963 patent No. 3,093,177 (issued to Joseph Villo) relating to the production of such fasteners. In December, 1969, SPS brought suit in this court against the plaintiff herein, USM Corporation (USM) and a licensee of USM, alleging infringement of that patent. Negotiations followed, resulting in an April, 1971, agreement by which USM was licensed under the Villo patent and, under certain conditions, was granted a non-exclusive license to sublicense. Provisions of the agreement reciting the validity of the Villo patent, the scope of its claims, and the fact of USM's infringement were incorporated into a consent decree, dated May 3, 1971, disposing of the litigation.

For about three years USM paid royalties under the license agreement. However, it refused to make a payment falling due in April, 1974. Shortly thereafter, SPS correctly informed USM by letter that under the terms of the license agreement, if the royalty payment was not made within a sixty day cure period SPS would be entitled to terminate the agreement. On June 4, 1974, USM brought this action, asserting on various grounds the invalidity and unenforceability of the Villo patent, and that it had not infringed. Count VII of the amended and supplemental complaint sought an injunction *pendente lite* relieving USM of its obligation to pay royalties. By agreement of the parties, the withheld royalty payment and the following one were paid to SPS under court orders which in effect permitted SPS to hold the funds pending the outcome of the litigation. SPS then refused to continue this procedure, and the court denied USM's request for an injunction *pendente lite*. This ruling was affirmed on appeal. *USM Corp. v. Standard Pressed Steel Co.*, 524 F.2d 1097 (7th Cir. 1975)

Presently before the court are four motions by the defendant, SPS.

SPS has moved to dismiss Count III of the amended and supplemental complaint for lack of subject matter jurisdiction. Count III seeks a declaration that the Villo patent is invalid for failure to comply with 35 U.S.C. §§ 101, 102, 103, and 112, and that it has not been infringed by USM. SPS argues that unless the licensee first repudiates his license by withholding royalty payments, such a claim neither presents a justiciable controversy nor arises under the patent laws. The court is reminded in this connection that USM has of its own volition continued paying royalties in order to preserve its license. This argument, however, must fail.

■ First, where a licensee reasonably fears that if he withholds royalty payments an infringement suit will be forthcoming his request for a declaration of the invalidity of the underlying patent clearly presents a justiciable controversy. To establish an actual controversy in an action challenging the validity of a patent the plaintiff must (1) disclose conduct on the part of the defendant that makes reasonable the plaintiff's apprehension that he will face an infringement suit or the threat of one if he commences or continues a given activity, and (2) show that he has a real stake in the outcome of the controversy, i. e., a real interest in commencing or continuing the activity in question. *See Super Products Corp. v. DP Way Corp.*, 546 F.2d 748, 753 (7th Cir. 1976); *Stickler Industrial Supply Corp. v. Blaw-Knox Co.*, 367 F.2d 744 (7th Cir. 1966). Here, the license agreement provides that SPS may terminate the license upon the default of USM. Moreover, SPS has suggested its intention to do so should the opportunity arise. USM's stake in the outcome lies in its desire to avoid liability for royalties. There is, then, an actual case or controversy. *See, e. g., Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 187 n. 4 (2nd Cir. 1977); *Dahlgren Manufacturing Co. v. Harris Corp.*, 399 F.Supp. 1253, 1255–56 (N.D.Tex. 1975).

■ Secondly, in this case, the declaratory action arises under the patent laws. Where the declaratory plaintiff is already the defendant in a state court action on the license for royalties, and where diversity is lacking, the declaratory action does not arise under the patent laws because it is

brought solely as a means of defending a state court suit. *Milprint, Inc. v. Curwood, Inc.*, 562 F.2d 418 (7th Cir. 1977); *Thiokol Chemical Corp. v. Burlington Industries, Inc.*, 448 F.2d 1328 (3d Cir. 1971) *cert. denied* 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668; and *see Public Service Commission of Utah v. Wycoff Company, Inc.*, 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952). However, where, as here, there is a reason for anticipation of an infringement action, a different conclusion should result. As the court said in *Warner-Jenkinson Co. v. Allied Chemical Corp., supra,* 567 F.2d at 186–87:

> "We first address the question of subject matter jurisdiction, . . . . The Declaratory Judgment Act, 28 U.S.C. § 2201, does not independently create federal jurisdiction. According to *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), an action for declaratory judgment may be brought in federal court ordinarily only if there would exist a basis for federal jurisdiction in a coercive action between the two parties. See also *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 249, 73 S.Ct. 236, 97 L.Ed. 291 (1952). If the plaintiffs were seeking a declaration simply of their right to assert patent invalidity as a defense to a contract action for royalties, which itself could not be brought in federal court, see e. g., *Luckett v. Delpark,* 270 U.S. 496, 502, 510, 46 S.Ct. 397, 70 L.Ed. 703 (1926); *Arvin Industries, Inc. v. Berns Air King Corp.,* 7 Cir., 510 F.2d 1070 (1975); see generally *Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), one might conclude that no 'arising-under' jurisdiction would be present. See *Thiokol Chemical Corp. v. Burlington Indus., Inc.,* 448 F.2d 1328, 1330–31 (3d Cir. 1971), cert. denied, 404 U.S. 1019, 92 S.Ct. 684, 30 L.Ed.2d 668 (1972). See also *Hanes Corp. v. Millard,* 174 U.S.App.D.C. 253, 531 F.2d 585, 594–95 n. 8 (1976).

> However, a second, and perhaps more important, reason why the plaintiffs want a declaration of patent invalidity is for its use as a defense in a patent infringement action. Under their licensing arrangement, nonpayment of royalties constitutes a material breach which gives the patentee the right to terminate the license prospectively. Thus, within a few months after the plaintiffs become liable for payment of royalties under contract law, they will also be subject to an action in federal court for an injunction and damages for infringement, see *Luckett v. Delpark, supra,* 270 U.S. at 510, 46 S.Ct. 397. At the present time the defendant has neither a state contract action nor a federal infringement action since the plaintiffs have not stopped paying royalties. One act on the part of the declaratory plaintiffs nonpayment of royalties, will leave them vulnerable to federal as well as state claims by the declaratory defendants. Accordingly, plaintiffs' action for declaratory judgment is raising a defense in anticipation of an impending, federal action, and federal 'arising under' jurisdiction is clearly present under *Skelly Oil* and *Wycoff*."

Accord: *Milton Roy Co. v. Bausch & Lomb, Inc.,* 418 F.Supp. 975, 978–79 (D.Del.1976); *Dahlgren Manufacturing Co. v. Harris Corp., supra; Medtronic, Inc. v. American Optical Corp.,* 327 F.Supp. 1327, 1331 (D.Minn.1971). The propriety of such a view seems to have been recognized by the Seventh Circuit in *Milprint, Inc. v. Curwood, Inc., supra,* 562 F.2d at 421.

■ Finally, it should be noted that SPS has not taken issue with the allegations of the complaint to the effect that the parties are of diverse citizenship and that the amount in controversy exceeds $10,000 exclusive of costs and interest. Hence, jurisdiction over Count III exists regardless of whether it might otherwise be held to arise under the patent laws. *Milprint, Inc. v. Curwood, Inc., supra,* 562 F.2d at 422 n. 5; *Arvin Industries, Inc. v. Berns Air King,* 510 F.2d 1070 (7th Cir. 1975).

Accordingly, SPS's motion to dismiss Count III for lack of subject matter jurisdiction is denied.

Next, SPS moves for summary judgment on Count III on the basis that the May 3, 1971, consent decree is *res judicata* as to the issues of the validity and infringement of the Villo patent. It is clear in this circuit and elsewhere that a consent decree containing an adjudication of the validity of a patent, but lacking an express or implied adjudication of infringement, will not be accorded *res judicata* effect in a later action between the parties. *Kraly v. National Distillers & Chemical Corp.,* 502 F.2d 1366 (7th Cir. 1974); *Business Forms Finishing Service, Inc. v. Carson,* 452 F.2d 70 (7th Cir. 1971); and *see e. g., Addressograph-Multigraph Corp. v. Cooper,* 156 F.2d 483 (2nd Cir. 1946). However, "the question . . . whether a consent judgment adjudicating infringement as well as validity bars a party to the judgment from subsequently challenging the validity of the patent has not been decided by . . . [the Seventh Circuit]." *USM Corp. v. Standard Pressed Steel Co.,* 524 F.2d 1097 (7th Cir. 1975). In opposing the motion, USM argues that such an application of *res judicata* is precluded by *Lear v. Adkins,* 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear,* a patent licensee sought to raise the invalidity of the underlying patent as a defense to the patentee's suit for royalties, there having been no prior litigation between the parties concerning the patent. At the time, the law afforded at least some support for the notion of licensee estoppel, which precluded a licensee from attacking the validity of the underlying patent so long as his license remained intact. The court framed the issue as one of determining priority between the principles of contract law upon which licensee estoppel was based and the public policy favoring free competition in the use of ideas not meriting patent protection. 395 U.S. at 670, 89 S.Ct. 1902. In this vein the court rejected the doctrine of licensee estoppel, concluding that:

> "Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Li-

censees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification. We think it plain that the technical requirements of contract doctrine must give way before the demands of the public interest in the typical situation involving the negotiation of a license after a patent has issued." 395 U.S. at 670–71, 89 S.Ct. at 1911.

It can well be said, then, that the present situation differs significantly from that in *Lear.* Here, unlike in *Lear* the license agreement entered into by the parties has been merged, in its relevant provisions, into a consent decree. Such a decree is to be viewed as a judicial act, rather than as a contract, *United States v. Swift & Co.,* 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932), and is generally accorded full *res judicata* effect. *United States v. Southern Ute Indians,* 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971); *Wallace Clark & Co., Inc. v. Acheson Industries, Inc.,* 532 F.2d 846 (2nd Cir. 1976); 1B Moore's Federal Practice § 0.409[5]. The doctrine of *res judicata* is not an entirely inflexible one, however, and rare exceptions are made for reasons of public policy. 1B Moore's Federal Practice § 0.405[11]. Such exceptions have been recognized in the context of patent litigation. *See Schlegel Manufacturing Co. v. USM Corp.,* 525 F.2d 775, 778–79 (6th Cir. 1975). The issue then becomes whether in the present context the public's interest in stripping an invalid patent of its government-protected monopoly so counterbalances the policy considerations underlying the doctrine of *res judicata* —considerations surely more fundamental than those founding the once doctrine of licensee estoppel— as to warrant the creation of another such exception.

Bearing this in mind, *res judicata* effect should be given to the May 3, 1971, consent decree. While it is indeed a difficult assessment to make, this court is inclined to agree with the view that:

"The danger of some extension of unwarranted monopolies is outweighed, . . . by the threats to enforcement of valid patents and proliferation of expensive and time consuming litigation necessarily following upon denial of the usual res judicata effect to such decrees." *Wallace Clark & Co., Inc. v. Acheson Industries, Inc.*, 532 F.2d 846, 849 (2nd Cir. 1976); and *see Schlegel Manufacturing Co. v. USM Corp.*, 525 F.2d 775 (6th Cir. 1975) Moreover, unlike in *Lear* it does not appear in this case that the juxtaposed policies are necessarily in direct conflict. More specifically, a persuasive argument can be made that the public interest in close scrutiny of patents would in itself be better served by affording *res judicata* effect to such a consent decree. It seems somewhat anomalous to strive to free useful ideas from the constraints of invalid patents by providing interested parties with a convenient means of postponing adjudication which might achieve such a result. As the court said in *Schlegel, supra,* 525 F.2d at 781:

"The public interest requires that an invalid patent be stripped of its monopoly, and at as early a date as possible. When a consent decree is to be given res judicata effect, litigants are encouraged to litigate the issue of validity rather than foreclosing themselves by a consent decree. If they were given a second chance to litigate the issue of validity, alleged infringers might well accept a license under a consent decree and forego an attack on validity until favored by a stronger financial position, or until threatened by other manufacturers who were not paying royalties. By giving res judicata effect to consent decrees this court protects the public interest in that an alleged infringer is deprived of a judicial device which could be used to postpone and delay a final adjudication of validity."

And *see Res Judicata Effects of Consent Judgments in Patent Infringement Litigation,* 36 Federal Bar Journal 171 (1977).

Finally, this court recognizes and dismisses the possibility of adopting a case-by-case approach to the *res judicata* issue. Such an approach might involve consideration of such factors as the extent to which discovery on the issues of validity and/or infringement was taken prior to entry of the consent decree, the degree of judicial involvement in and scrutiny of negotiations resulting in the parties' agreement, the time remaining in the life of the patent, and the size of any royalty payments required. In the related context of determining the proper *res judicata* effect of a patent litigation settlement agreement not incorporated in a court decree the Second Circuit has expressly rejected such an approach, finding that it would "leave the parties at the mercy of what inevitably would be an imprecise and uncertain test." *Warner-Jenkinson Co. v. Allied Chemical Corp.*, 567 F.2d 184, 188 (2nd Cir. 1977). Cf.: *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368 (6th Cir. 1976). This observation is equally true and decisive here, the need for some clear and certain rule being of paramount importance in both contexts.

Accordingly, SPS's motion for summary judgment on Count III is granted.

SPS's third motion is one for summary judgment on Count II. Count II alleges that certain provisions included in the April, 1971, SPS–USM license agreement at SPS's insistence constitute misuse of the Villo patent, rendering the patent and license agreement unenforceable. The license agreement provides that, in the general case, USM is to pay SPS 25% of any royalties collected from sublicensees. However, with respect to each of four named corporations which SPS had already licensed under the Villo patent, USM, if it granted a sublicense, was to pay SPS 75% of any royalties, unless the sublicensee maintained its SPS license. If one of the named SPS licensees became a USM sublicensee, it would be permitted to deduct most (75%) but not all of its royalty payments to SPS from the amounts due to USM.

A wide variety of practices may constitute patent misuse. Many of these involve particular types of license restrictions. In each case, however, the essence of patent misuse consists of an attempt by the

patent holder to gain for himself rights not inherent in the patent itself, or to extend his monopoly beyond that legally granted to him. 7 Deller's Walker on Patents § 518 (1972). Here, USM has presented evidentiary materials which, although not entirely uncontradicted, indicate that the sole purpose of the differential royalty rates was to erect an economic barrier to its sublicensing of the four SPS licensees, thereby preserving for SPS a market in patch-type fasteners free from the competition of USM's less expensive production technique. Even if this is accepted as wholly correct, this court would not characterize the arrangement as a patent misuse. The very essence of the patent grant is the exclusive right to manufacture, use, and sell the patented article. Thus, as assignee of a patent, SPS was legitimately entitled to have for itself a competition-free monopoly over the entire market for fasteners falling within the scope of its claims. It would seem necessarily to follow, then, that absent some tendency of the license restrictions to restrict competition in areas outside the patent, SPS could simply relinquish a portion of its monopoly market, retaining the rest for itself. This in effect is no different from the use of territorial or field of use limitations in a patent license. Such restrictions are generally upheld, 8 Deller's Walker on Patents § 649, § 651 (1973). Moreover, given this court's finding of the *res judicata* effect of the prior consent decree as to the issues of the validity and infringement of the Villo patent, it cannot be argued that SPS misused the Villo patent by seeking to enforce it with respect to goods falling outside of its claims. However, Count IV of the amended and supplemental complaint, which alleges patent misuse in the form of attempting to enforce a patent obtained by fraud, remains.

Accordingly, SPS's motion for summary judgment on Count II is granted.

Finally, SPS has moved for separate trials of Counts III and IV, with Count IV to be tried first. In view of the rulings contained herein, this motion is mooted. Counts V and VI, alleging antitrust violations, have previously been severed for tri-

al. Counts II and III have been disposed of. That portion of Count I which can be said to remain merely asks that certain portions of the 1971 consent decree be set aside on the basis that the Villo patent was obtained by fraud. Hence the allegations of Count IV now stand alone for trial, to be followed, if necessary, by trial of Counts V and VI.

In summary, then:

1. SPS's motion to dismiss Count III is denied.

2. SPS's motion for summary judgment on Count III is granted.

3. SPS's motion for summary judgment on Count II is granted.

4. SPS's motion for separate trials is mooted.

Further, this court finds, pursuant to Rule 54(b) F.R.Civ.Pro., that there is no just reason for delay in the entry of final judgment on its findings herein granting SPS's two motions for summary judgment, and directs the entry of judgment on Counts II and III accordingly.