**SOUTHERN UTE INDIAN TRIBE, Plaintiff,**

v.

AMOCO PRODUCTION COMPANY; Shirley K. Adams; Henry Ashworth; Carla M. Aspaas; Eric K. Aspaas; Helen Ruth Aspaas; Laura Belle Aspaas; Leta M. Adkins; Rita M. Adkins; Maxwell C. Anderson; Earl A. Barker; Heirs of Maurice C. Breen, Deceased; Horace F. Buchanan; The Heirs of Horace Buchanan, Deceased; George A. Bugg; Carbone Investment Company; Jack Carmack; Rowland Carmack; Joseph C. Ciancio; William Kemp Clark; Colorado National Bank of Denver as Trustee of the George Veto Trust; The Colorado National Bank of Longmont as Conservator of the Estate of Gladys N. Frazzini, Deceased; Dorothy A. Corgin; The Heirs of Kelly Cox, Deceased; A.B. Crosby; Barbara Crosby; David Crosby; John Crow, Jr.; Margaret Crow; Manuel Cruz; Louis M. Cummins; Frederick E. Dickerson; J.M. Eakes; Robert McFerran Eakes; Margaret Ellison; Sally M. Etterbeck; Minnie Flaks; Tillie Flaks; Cassio Frazzini; Adele Frost; Robert Galbasin; Abel S. Gallegos; Montey Garnand; Ruby Gibbs Goggans; Christine Hamilton; Hardin Simmons University; The Heirs of H.A. Harmon, Deceased; Katherine Frances McElvain Harvey; The Shareholders of Hondo Oil & Gas Corporation; Charles Kettering; Fidel Lucero; Richard C. Malcomb; Suzanne Heath Manges; Katherine B. McElvain; Mabel McElvain; Thornton H. McElvain, Jr.; Dorothy N. McKelvey; Edwin L. McKelvey; R. Franklin McKelvey; W.R. McMahon McMurry Oil Company; W. Clay Meredith Charitable Trust; The Heirs of W.A. Moncrief, Deceased; Roy E. Montgomery, Personal Representative for the Estate of W. Clay Meredith, Deceased; The Heirs of Forrest D. Miller, Deceased; The Heirs of Helen L. Miller, Deceased; Thomas S. Morrissey; Thomas J. Morrissey; Emil Mosbacher; Emil Mosbacher, III; John David Mosbacher; R. Bruce Mosbacher; Myra Theresa Moulds; North Central Oil Corporation; H.L. Oliver; Clara Onofrio; Margaret C. Pargin; Harold F. Payne, Jr.; Neville G. Penrose; Ben M. Peterson, Jr.; Frederick Petrocco; Phillips Petroleum Company; James M. Raymond; The Heirs of W.E. Rennie, Deceased; Thomas C. Romolo; Benton E. Smullyen; Clinton I. Smullyen; William Stirling; The Heirs of J.L. Tatum, Deceased; Anna Carleo Tomeo; Ernest Tomeo; Turner Securities; Richard W. Turner, Sr.; The Heirs

of George C. Vance, Deceased; Anthony H. Veto; Joseph F. Ware, Jr.; Albert E. Zarlengo; Anthony F. Zarlengo; John Doe and all Other Unknown Persons Claiming an Interest in the Mineral Estate Located Within the N/2 of Section 12, T33N, R8W, N.M.P.M., La Plata County, Colorado; Amax Oil & Gas, Inc.; Bowen/Edwards Associates, Inc.; Conoco, Inc.; Fuel Resources Development Company; J.M. Huber Corporation, Oil and Gas Division; Markwest Energy Partners Limited; McKenzie Methane Corporation; Meridian Oil, Inc.; Mobil Oil Corporation; National Cooperative Refinery Association; Northwest Pipeline Corporation; Pablo Operating Company; Palo Petroleum, Inc.; Palo/Eagle Joint Ventures; Richmond Petroleum, Inc.; Tiffany Gas Company; Williams Production Company; Union Texas Petroleum Corporation; John Doe Oil Company and all Other Unknown Persons or Entities Claiming Leasehold Working Interests or Operating Rights to Explore for, Produce or Develop Coalbed Methane or Coal Constituents from Coal or Coal Strata Reserved by The United States in Patents Issued Under the Act of March 3, 1909, or the Act of June 22, 1910, for Lands Located Within the Exterior Boundaries of the Southern Ute Indian Reservation, and Which Entities Have not Obtained Tribal Consent to and Federal Approval of Said Exploration, Production or Development Activities; Manuel Lujan, Jr., Secretary of the United States Department of the Interior; The United States Department of the Interior and its Subordinate Agencies; The Bureau of Indian Affairs; The Bureau of Land Management; The Minerals Management Service; Eddie F. Brown, Assistant Secretary of the Bureau of Indian Affairs; Delos Cy Jamison, Director of the Bureau of Land Management; Scott S. Sewell, Director of the Minerals Management Service; Class of Defendants Situated Similarly to those Named Non–Governmental Defendants who Claim Ownership of an Interest in Coalbed Methane and Other Coal Constituents or Claim the Right to Explore for, Develop or Produce those Substances from Coal or Coal Strata Reserved by The United States in Patents Issued Under the Act of March 3, 1909, or the Act of June 22, 1910, for Lands Located Within the Exterior Boundaries of the Southern Ute Indian Reservation and Which Class Members Have not Obtained Tribal Consent to and Federal Approval of Said Interests or Rights, Defendants.

91–B–2273.

United States District Court,
D. Colorado.

Sept. 13, 1994.

Thomas H. Shipps, Frank E. Maynes, Maynes, Bradford, Shipps & Sheftel, Durango, CO, Michael McConnell, Long & Jaudon, P.C., Denver, CO, Scott B. McElroy, Alice E. Walker, Greene, Meyer & McElroy, Boulder, CO, for plaintiff.

Robert C. Hawley, Lino S. Lipinsky, de Orlov, Hawley & Vanderwerf, P.C., Denver, CO, Russell D. Howell, Houston, TX, for Conoco, Inc.

Lon W. Abadie, Thomas P. Dugan, Dugan & Associates, Durango, CO, for J.M. Huber Corp.

William Godsman, Salmon, Godsman & Nicholson, Englewood, CO, for Hondo O & G & Palo Petro.

Robert L. McCamey, Jr., Richmond Petroleum, Inc., Dallas, TX, for Richmond Petroleum.

Peter A. Bjork, Laura Lindley, Bjork, Seavy, Lindley, & Danielson, P.C., Denver, CO, for North Cent. Oil Corp. & Mobil Oil.

R. Dennis Ickes, Larry L. Whyte, Marilynn Fineshriber, Nielsen & Senior, Salt Lake City, UT, for Mobil Oil Corp.

Charles Carpenter, Frederick Douglas, Denver, CO, for Fuel Resources Develop. & Natl. Co-op Refinery.

Lynn P. Hendrix, Marla J. Williams, Holme Roberts & Owen, Denver, CO, for Amax Oil & Gas.

Dante L. Zarlengo, Denver, CO, for Bowen/Edwards Assoc.

Frank J. Anesi, Durango, CO, for Tiffany Gas.

David C. Little, Kevin J. Kuhn, Montgomery, Little & McGrew, Englewood, CO, Susan L. Heady, Amarillo, TX, for Phillips Petroleum Co.

Anthony F. Zarlengo, pro se.

L.W. McDaniel, McDaniel, McDaniel, Baty and Nicholson, Durango, CO, for Maxwell Anderson & Louis Cummins.

Daniel F. Warden, Faegre & Benson, Denver, CO, Theresa Silcox, Patricia E. Schmid, Northwest Pipeline Corp., Salt Lake City, UT, for Northwest Pipeline Corp. & Williams Prod. Co.

Thomas S. Nichols, Neil Peck, Charles L. Kaiser, Anthony Shaheen, Davis, Graham & Stubbs, David E. Brody, Denver, CO, for Amoco Production Co.

Stan L. Spangler, John L. Lawrence, Shaw, Spangler & Roth, Denver, CO, for Colo. Natl. Bank of Denver, Colo. Natl. Bank of Longmont.

Edwin L. McKelvey, Aurora, CO, Robert A. Galbasin, Denver, CO, for Landowner.

Hugh V. Schaefer, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, CO, for Tiffany Gas.

Thornton W. Field, Dept. of Justice, Gen. Litigation Section, Washington, DC, William G. Pharo, Asst. U.S. Atty., John R. Kunz, Regional Solicitor's Office, U.S. Dept. of Interior, Denver, CO, for Dept. of the Interior, et al.

T.H. McElvain Oil & Gas Properties, Sante Fe, NM, for Katherine McElvain Harvey, Katherine B. McElvain, Thornton H. McElvain.

William R. Thurston, Durango, CO, for Weaselskin Corp.

James P. Rouse, Burns, Wall, Smith and Mueller, P.C., Roger H. Lichty, Denver, CO, for McKenzie Methane Corp.

Mark J. Thurber, Claudia Wilson Frost, Baker & Botts, Houston, TX, Palo Petroleum & SG Interests I, Ltd.

Barry W. Spector, Denver, CO, for Markwest Energy Partners.

Robert D. Poulson, Alan B. Cameron, Poulson, Odell & Peterson, Denver, CO, for SG Interests I, Ltd.

Attorney General's Office, Natural Resources Section, Denver, CO, for State of Colo.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

The central issue in this case is whether in the Coal Lands Acts of 1909 and 1910 Congress reserved coalbed methane gas (CBM gas) in the United States when, under those acts, it reserved coal. I hold that Congress did not reserve CBM gas in the United States in the Coal Lands Acts of 1909 and 1910 and, consequently, Plaintiff, the Southern Ute Indian Tribe's (the Tribe) claim of equitable ownership to CBM gas in the lands at issue fails. Although this key question and its answer are simply stated, their basis necessarily requires considerable discussion.

The Tribe sued Amoco Production Company (Amoco), other oil companies, and individuals who claim various ownership interests to CBM gas contained in coal strata which previously had been reserved in the federal government under the Coal Lands Acts of 1909 and 1910, seeking declaration of ownership in the CBM gas, injunctive relief and damages based upon various theories including trespass and conversion. The Tribe also sued various federal governmental entities (federal defendants) claiming breach of fiduciary duty to manage the Tribe's trust resources. The federal defendants are Manuel Lujan, Jr., Secretary of the United States Department of the Interior, the Department of the Interior and its subordinate agencies, the Bureau of Indian Affairs, the Bureau of Land Management, the Minerals Management Service, Eddie F. Brown, Assistant Secretary of the Bureau of Indian Affairs, Delos Cy Jamison, Director of the Bureau of Land Management, and Scott S. Sewell, Director of the Minerals Management Service.

I certified a defendant class pursuant to Fed.R.Civ.P. 23(b)(2) to determine two issues (1) ownership of the CBM gas and (2) the existence and applicability to the ownership question of several defenses "common" to the non-federal defendant class comprised of all defendants except the federal defendants. Amoco was named as the defendant class representative. See Case Management Order No. 1. The federal defendants argue the Tribe's claim against them is barred by the applicable statute of limitations.

These issues are framed by cross-motions for summary judgment and the federal defendants' alternative motion to dismiss. The motions have been exhaustively briefed and argued. In view of my holding on the central question, I conclude that summary judgment should be awarded in favor of the defendant class and against the Tribe on the issue of CBM gas ownership. I further conclude that the federal defendants' motion for summary judgment should be granted on the issue of breach of fiduciary duty for the alleged failure to manage CBM gas as a tribal resource. Still remaining for future resolution are the Tribe's claims not dependent upon the ownership issue.

■ Jurisdiction is proper under 28 U.S.C. §§ 1331, 1361, and 1362. Under § 1362 the district court has original jurisdiction of the case brought by the Tribe against each of the defendants except the United States. Under 28 U.S.C. § 1505, the Court of Claims has jurisdiction to hear the Tribe's claim against the United States but this jurisdiction is not exclusive. *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F.Supp. 1238, 1242–43 (N.D.Cal.1973).

## I.

### *Summary Judgment Standard*

■ Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th

Cir.1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir.1980); Fed. R.Civ.P. 56(e).

### *Burden of Proof*

Fed.R.Civ.P. 56 ordinarily allocates the burden of proof in motions for summary judgment. But in matters relating to property rights of Indians, the burden of proof to be employed is defined in 25 U.S.C. § 194:

> In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership.

If the requirements of 25 U.S.C. § 194 are met, the burden of proof is placed on the non-Indian party, in this case the non-federal defendant class. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 669, 99 S.Ct. 2529, 2538–39, 61 L.Ed.2d 153 (1979). Although the parties have expended considerable energy arguing the applicability of § 194 to the ownership question, as will be seen, the ownership question turns as a matter of law on pure statutory construction.

## II.

### *Background and History*

The Tribe claims ownership of CBM gas found in the coal strata located on the Southern Ute Indian Reservation in southwestern Colorado. Approximately 200,000 acres within the exterior boundaries of the Tribe's reservation are held in fee by private persons and contain CBM gas now valued conservatively at $200,000,000. Presently, many non-Indian fee holders are receiving ownership benefits connected with the CBM gas in the form of revenues either from the sale of CBM gas or from oil and gas leases held by oil companies. An historical backdrop is nec-

essary to understand the results obtained here.

In the second half of the 19th century, several tribes of Indians individually known as the Uncompahgre Utes, the White River Utes, and the Southern Utes, came to be known collectively by the United States as the Confederated Bands of Utes. At the urging of the United States, the Confederated Bands of Utes exchanged their aboriginal lands in New Mexico, Utah, and Colorado for a reservation of more than 15 million acres located entirely in Colorado. *United States v. Southern Ute Tribe*, 402 U.S. 159, 161–62, 91 S.Ct. 1336, 1337–38, 28 L.Ed.2d 695 (1971); 15 Stat. 619 (1868); 13 Stat. 673 (1864). In 1874, after learning of valuable mineral deposits on the reservation, the United States urged, and the Confederated Bands of Utes approved, the Brunot Cession to the United States of 3.7 million acres located in the middle of the reservation. *Southern Ute*, 402 U.S. at 162, 91 S.Ct. at 1338; 18 Stat. 36 (1874). As a result, the reservation boundaries changed and the Southern Utes came to occupy a strip of land approximately 15 miles wide and 110 miles long (referred to as Royce Area 617) at the southernmost portion of the reservation.

By 1880, the Southern Utes were alone on the reservation, the Northern Utes having relocated to Utah. Public outcry over the "Meeker Massacre" in which twelve non-Indians were killed led to the Act of 1880, ch. 223, 21 Stat. 199 (1880 Act), the central goal of which was the "termination of tribal ownership in the reservation lands...." *Southern Ute*, 402 U.S. at 163, 91 S.Ct. at 1338. The 1880 Act provided that the Confederated Bands "cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement." 21 Stat. 200 (1880). The provisions for settlement resulted in the removal of the Northern Utes to Utah and the settlement of the Southern Utes to unoccupied agricultural lands on the La Plata River in Colorado. In keeping with the express congressional purpose to destroy tribal structure, *see* 10 Cong.Rec. 2059, 2066 (1880), the Act also limited Indian land ownership to a specific amount of land allotted in severalty to individual Indians. The Act also provided that "all the lands not so allotted, the title to which is ... released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal," for the financial benefit of the Utes. *Southern Ute*, 402 U.S. at 163–64, 91 S.Ct. at 1339.

The Supreme Court has left no doubt as to the meaning and effect of the 1880 Act. "The central feature of the Act of 1880 was the *termination of tribal ownership* in the reservation lands, and the limitation of Indian ownership to such lands as might be allotted in severalty to individual Indians." *Southern Ute*, 402 U.S. at 163, 91 S.Ct. at 1338 (emphasis added). All lands not allotted in severalty to individual Indians, then, including the lands in question here, were conveyed by the Utes, *Id.* at 169, 91 S.Ct. at 1341, to become public lands of the United States. 21 Stat. 203 (1880).

Over the next several decades, the ceded, non-allotted lands (surplus lands) that had previously made up the reservation were open to public entry and settlement under the public land laws. 28 Stat. 677–78 (1895). These laws included the Homestead Act of 1862, 43 U.S.C. § 161 et seq. (repealed 1976), the Coal Lands Act of 1873, 17 Stat. 607, and the Mining Law of 1872, 30 U.S.C.A. § 22. Under these laws, entrymen could, upon satisfaction of certain patent requirements depending on how the land was classified, obtain a fee simple absolute title to the land. Specifically, homesteaders could enter agricultural lands and obtain fee simple absolute title to 160 acres without payment, *see e.g.* 3 Stat. 566 (1820), coal miners could enter coal lands and obtain fee simple absolute title to 160 acres upon payment of not less than either $10 or $20 per acre depending upon the distance of the land from the nearest railroad, 17 Stat. 607 (1873), and oil and gas explorers could enter mineral lands, locate and perfect gas placer claims, and obtain fee simple absolute title upon payment of $2.50 per acre. 30 U.S.C. § 29, 30, 37 (1988).

In practice however, the application of the various public land laws left much to be desired, in large part because the Department of the Interior did not investigate and

classify lands before allowing entry. Rather, the Department relied on entrymen to classify their own parcels of land as chiefly valuable for agriculture, coal, or minerals. Consequently, patents to millions of acres of land were issued based largely on statements of entrymen as to the nonmineral character of the land. *See e.g. Watt v. Western Nuclear, Inc.,* 462 U.S. 36, 48, n. 9, 103 S.Ct. 2218, 2225, n. 9, 76 L.Ed.2d 400 (1983); U.S. Geological Survey, *The Classification of the Public Lands,* pp. 12–13, 32–33 (1913).

The resulting misclassification of lands occurred mainly for two reasons. First, entrymen made good faith mistakes in classifying their lands because it was often difficult to determine whether the land was more valuable for the minerals it contained or for the more obvious agricultural purpose. *See Deffeback v. Hawke,* 115 U.S. 392, 405, 6 S.Ct. 95, 101, 29 L.Ed. 423 (1885). *See also Watt v. Western Nuclear, Inc.,* 462 U.S. at 48, n. 9, 103 S.Ct. at 2225, n. 9. Second, in recognition of coal as the nation's chief energy resource, the price an entryman had to pay to obtain title to coal lands substantially exceeded that for other types of lands. In addition, a greater amount of land was needed to support a coal mining operation than could be obtained lawfully under the Coal Lands Act of 1873. Thus, incentives existed for entrymen to cheat by misclassifying lands valuable for coal. As a result, patents were issued to millions of acres of western coal lands which had been misclassified as non-coal lands.

The tide of events during the first decade of the 20th century focused national attention on coal lands and precipitated great debate over management of the country's primary energy resource. First, coal was the chief energy resource fueling the nation's shift from an agrarian economy to an industrial economy. The coal supply had been plentiful but during this period, a coal shortage struck the west. *See* 40 Cong.Rec. 8448 (1906); *Coal Lands and Coal–Lands Laws of the United States,* 59th Cong., 1st Sess., 38 (Jan. 9, 1907); *Coal Lands and Coal–Lands Laws of the United States,* 59th Cong., 1st Sess., 27 (Jan. 14, 1907); *See* C. Mayer & G. Riley, *Public Domain, Private Domain—A History of Public Mineral Policy in America,* 114–130 (1985). Next, it became clear that coal lands were being obtained by fraud. *See e.g.,* 41 Cong.Rec. 450 (1906); *Coal Lands and Coal–Lands Laws of the United States,* 59th Cong., 1st Sess., 6 (Dec. 17, 1906) (½ to ⅔ of coal lands entered by unlawful means); *Mayer & Riley,* at 117 (although 6 million acres of coal lands were transferred into private ownership between 1873 and 1906, only an estimated 400,000 acres were sold under authority of Coal Lands Act of 1873). Finally, the railroad monopolies had fraudulently acquired vast amounts of coal lands and engaged in price-fixing to maintain their near "absolute control over all production and transportation and marketing of coal." *See e.g., Coal Lands and Coal–Lands Laws of the United States,* 59th Cong., 1st Sess., 7 (Dec. 17, 1906); *Mayer & Riley,* at 119–123; *Report of Investigation by Interstate Commerce Commission into Railroad Discriminations and Monopolies in Coal,* S.Doc. No. 450, 60th Cong., 1st Sess., 2 (1908); Dec. 17, 1906 Hearing, pp. 1–18; H.R.Rep. 7643, 59th Cong., 2d Sess., 6 (1907).

Concerned about the impact of extensive land fraud on the need to develop and dispose of coal "under conditions which would inure to the benefit of the public as a whole," 41 Cong.Rec. 2615, 2806–08 (1907), President Theodore Roosevelt ordered the Department of Interior to withdraw from entry, lands that contained "workable coal" and to suspend issuance of patents on the lands withdrawn. 41 Cong.Rec. 2614–15 (1907). This order affected more than 65 million acres of land located in several western states including Colorado. *See e.g.* P. Gates, *History of Public Land Law Development,* 726 (1968); T. Larson, *History of Wyoming* 379 (1965). Approximately 1.47 million acres of the withdrawn lands were located near Durango, Colorado, *see Coal Lands and Coal–Lands Laws of the United States,* 59th Cong., 1st Sess., 15 (Dec. 18, 1906) including the acreage involved in this case.

President Roosevelt expressly stated that the reason for ordering the withdrawal included "the extremely unsatisfactory condition of the public land laws and . . . the prevalence of fraud . . . ." *See* 41 Cong.Rec.

450 (1906). He advised Congress that he had "temporarily withdrawn from settlement" lands containing workable coal until the "question ... can be settled by legislation." *See Message of the President of the United States Communicated to the Two Houses of Congress at the Beginning of the Second Session of the 59th Congress,* p. 17 (Dec. 4, 1906).

Not surprisingly, President Roosevelt's action caused great distress to thousands of homesteaders who had entered upon and worked the land. *See* H.R.Rep. No. 2019, 60th Cong., 2d Sess., 1–3 (1909). To address homesteaders' valid concerns for their feared loss of time and labor in the land, and also to respond to the nation's need to protect and develop coal as an energy resource, Congress passed the Coal Lands Act of 1909 (the 1909 Act). This legislation reserved to the United States "all coal" contained in the withdrawn lands upon which entry had been made. It provided:

> Any person who has in good faith located, selected, or entered under the nonmineral land laws of the United States any lands which subsequently are classified, claimed, or reported as being valuable for coal, may, if he shall so elect, and *upon making satisfactory proof of compliance with the laws under which such lands are claimed, receive a patent therefor, which shall contain a reservation to the United States of all coal in said lands,* and the right to prospect for, mine, and remove the same. The coal deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal-land laws in force at the time of such disposal, but no person shall enter upon said lands to prospect for, or mine and remove coal therefrom without previous consent of the owner under such patent, except upon such conditions as to security for and payment of all damages to such owner caused thereby as may be determined by a court of competent jurisdiction. The owner under such patent shall have the right to mine coal for use on the land for domestic purposes prior to the disposal by the United States of the coal deposit. Nothing herein contained shall be held to affect or abridge the right of any locator,

selector, or land located, selected, or entered by him. Such locator, selector, or entryman who has made or shall make final proof showing good faith and satisfactory compliance with the law under which his land is claimed shall be entitled to a patent without reservation unless at the time of such final proof and entry it shall be shown that the land is chiefly valuable for coal.

(Mar. 3, 1909, c. 270, 35 Stat. 844) (emphasis added).

Although the 1909 Act addressed the concerns of homesteaders already settled on lands subsequently withdrawn, western congressional leaders remained concerned about future settlement of their region given the vast tracts withdrawn as coal lands:

> [U]nless we have some legislation whereby entrymen, under reasonable restrictions, can be prevailed upon to settle upon and cultivate such of these lands as are adapted to agricultural purposes, very extensive areas will remain entirely undeveloped and unproductive except as they are utilized for grazing purposes.

*See* H.R.Rep. No. 377, p. 3. *See also* S.Rep. No. 703, p. 2; *See also* 45 Cong.Rec. 6050 (1910).

In response, Congress enacted the 1910 Coal Lands Act (the 1910 Act) containing provisions substantially similar to the 1909 Act but addressing prospective entries on lands classified as valuable for coal:

> That upon satisfactory proof of full compliance with the provisions of the laws under which entry is made, and of [sections 833 to 85 of this title], *the entryman shall be entitled to a patent to the land entered by him, which patent shall contain a reservation to the United States of all the coal in the lands so patented,* together with the right to prospect for, mine, and remove the same. The coal deposits in such lands shall be subject to disposal by the United States in accordance with the provisions of the coal-land laws in force at the time of such disposal. Any person qualified to acquire coal deposits or the right to mine and remove the coal under the laws of the United States shall have the right, at all

times, to enter upon the lands selected, entered, or patented, as provided by sections 83 to 85 of this title, for the purpose of prospecting for coal thereon upon the approval by the Secretary of the Interior of a bond or undertaking to be filed with him as security for the payment of all damages to the crops and improvements on such lands by reason of such prospecting. Any person who has acquired from the United States the coal deposits in any such land, or the right to mine or remove the same, may reenter and occupy so much of the surface mining and removal of the coal therefrom, and mine and remove the coal, upon payment of the damages caused thereby to the owner thereof, or upon giving a good and sufficient bond or undertaking in an action instituted in any competent court to ascertain and fix said damages. The owner under such limited patent shall have the right to mine coal for use upon the land for domestic purposes at any time prior to the disposal by the United States of the coal deposits. Nothing herein contained shall be held to deny or abridge the right to present and have prompt consideration of applications to locate, enter, or select, under the land laws of the United States, lands which have been classified as coal lands with a view of disproving such classification and securing a patent without reservation.

(June 22, 1910, c. 318, § 3, 36 Stat. 584) (emphasis added).

Over the next several decades more than 16 million acres in the west, including 1.35 million acres in Colorado, were patented under the 1909 and 1910 Acts. *See* U.S. Bureau of Land Management, *Public Land Statistics—1991*, p. 16 (1992). The patented lands in Colorado included the surplus lands on the Southern Ute Reservation which had been opened to non-Indian homestead entry. During the ensuing years then, numerous homesteaders were issued patents subject only to the United States' coal reservation. The non-federal defendant class in this case claim their respective rights, titles, and interests as successors in interest to these patentees.

In the mid 1930's, the United States initiated a marked shift in Indian policy from "allotment and assimilation" which deemphasized tribal existence by granting land allotments to individual Indians, *see* F. Cohen *Handbook of Federal Indian Law* Ch. 2, Sec. C, 127 (1982), to a "revival of tribalism." *See* F. Cohen *Handbook of Federal Indian Law* Ch. 2, Sec. D, 145 (1982). This new emphasis on tribal self-determination found statutory expression in the Indian Reorganization Act of 1934. 48 Stat. 984, Ch. 576 (June 18, 1934), codified at 25 U.S.C. §§ 461–479 (1988) (IRA). The IRA in pertinent part provided:

The Secretary of the Interior, if he shall find it to be in the public interest, is hereby authorized to restore to tribal ownership the *remaining surplus lands* of any Indian reservation opened ... [before June 18, 1934] ...

*Provided, however, That valid rights or claims of any persons to any lands so withdrawn existing on the date of the withdrawal shall not be affected by [sections 461–479 of this title]: ....*

25 U.S.C. § 463 (emphasis added) (italics in original).

In 1938, under the authority of the IRA, the Department of the Interior conveyed to the Tribe equitable title in approximately 200,000 acres of coal which previously had been reserved to the United States in patents issued over the years to non-Indian entrymen under the 1909 and 1910 Acts. The Tribe's claim in this action is based on the premise that reservation of the coal by the United States in the 1909 and 1910 Acts includes reservation of CBM gas which was restored to the Tribe in 1938 along with the coal.

As a result of the amalgam of methods by which one could obtain ownership of the land, presently the Tribe's reservation is a checkerboard of different types of ownership interests including tribal lands held in trust by the United States for the benefit of the Tribe, lands held by the Tribe in its own name, individual Indian land allotments subject to federal trust restrictions, land owned in fee simple by individual Indians, and lands held in fee simple by non-Indians. *Southern Ute Indian Tribe v. Board of County*

*Comm'rs*, 855 F.Supp. 1194, 1196 (D.Colo. 1994). With this historical backdrop about which I discern no genuine material factual dispute, I turn to the central issue in the case.

## III.

### *The Ownership Question*

The central question in this case is whether Congress included CBM gas in its reservation to the United States of "coal" under the Coal Lands Acts of 1909 and 1910.[1] I hold that, as a matter of law, Congress' reservation of coal in the United States in the Acts of 1909 and 1910 did not include reservation of CBM gas. Consequently, title to CBM gas in the lands at issue here was conveyed by United States patents issued to homesteaders under the 1909 and 1910 Acts upon surplus lands on the Tribe's reservation. Accordingly, the Tribe acquired no title to the CBM gas when, in 1938, under authority of the IRA, the United States restored the coal to the Tribe.

### A.

#### *Plain meaning*

■ The Tribe argues that the meaning of the word "coal" in the Acts of 1909 and 1910 is ambiguous because it might refer not only to rock but also to the gas contained in and around the rock. I disagree.

■ Statutory construction is a matter of law to be decided by the court. *United States v. Montoya*, 827 F.2d 143, 146 (7th Cir.1987). The primary task in construing a statute is "to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive." *Negonsott v. Samuels*, —— U.S. ——, —— ——, 113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457 (1993). The controlling congressional intent is that which exists as of the date of enactment of the statute. *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 62, 103 S.Ct. 2218,

2232–33, 76 L.Ed.2d 400 (1983). This rule has added significance here because the defendant class traces its ownership through chains of title beginning with U.S. patents issued under the 1909 and 1910 Acts. Thus, the relevant congressional intent is that which existed at the time of the passage of the Acts in 1909 and 1910.

■ In determining congressional intent, I look first to the language of the statute and assume that its plain meaning accurately expresses legislative purpose. *United States v. James*, 478 U.S. 597, 604, 106 S.Ct. 3116, 3120–21, 92 L.Ed.2d 483 (1986); *Consumer Product Safety Comm'n v. G.T.E. Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *United States v. Shriver*, 989 F.2d 898, 901 (7th Cir.1992). The apparent natural meaning of a statute will be preferred to any hidden, curious "signification." *United States v. Colorado & N.W.R.R.*, 157 F. 321, 332 (8th Cir.1907). I assume that the legislative purpose is expressed by the ordinary meaning of the words used. *Id.* Moreover, "if words of common use [are contained in a statute, they] are to be construed in their natural, plain and ordinary significance." *Balanced Rock Scenic Attractions v. Town of Manitou*, 38 F.2d 28, 30 (10th Cir.1930). The plain meaning of a word is not determined by reference to variations on its ordinary meaning, but by the ordinary meaning itself, *i.e.*, the way it is *generally* used. *Copeland v. MBNA America, N.A.*, 820 F.Supp. 537, 540 (D.Colo.1993). When Congress does not define a specific term, I may presume also that the drafters intended its ordinary meaning to attach to the word. *Russello v. United States*, 464 U.S. 16, 21, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983). It then is appropriate to look to general dictionary and encyclopedia definitions to ascertain the plain meaning of the word. *See Addison v. Holly Hill Fruit Products*, 322 U.S. 607, 617–18, 64 S.Ct. 1215, 1221–22, 88 L.Ed. 1488 (1944); *United States v. Jackson*,

---

1. Although I eschew footnotes, the Tribe's allusion to historic injustices wrought upon the indigenous peoples of America through European colonialization and by the concomitant concept of "manifest destiny," compels this note. My task is to discern the intent of Congress in 1909 and 1910. It is beyond my jurisdiction and the issues framed in this case to engage in an eschatological analysis of the wrongs perpetrated against American Indians.

759 F.2d 342, 344 (4th Cir.1985); *Torti v. United States*, 249 F.2d 623, 626 (7th Cir. 1957). And, statutes should be construed in a common sense fashion. *See First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 869 (4th Cir.1989).

The 1909 Act, codified at 30 U.S.C. § 81, provides that the patent "shall contain a reservation to the United States of *all coal in said lands....*" (emphasis added). The parallel language in the 1910 Act, codified at 30 U.S.C. § 85, states that the "patent shall contain a reservation to the United States of *all the coal in the lands* so patented...." (emphasis added).

The texts of the 1909 and 1910 Acts do not define the term "coal." General dictionaries and encyclopedias of the day, however, illustrate the common ordinary meaning of "coal." For example, the American Dictionary of the English Language 244 (1889) defined coal as "a black, or brownish black, *solid,* combustible substance consisting ... mainly of carbon." (emphasis added). Indeed, this definition is consistent with the definition of coal throughout the decades. The Webster's New International Dictionary of the English Language published in 1920 defined coal as "a black, or brownish black, *solid,* combustible mineral substance...." (emphasis added). *Id.* at 424. This definition of coal is not only virtually identical to the definition at the time of the passage of the Acts, but is also echoed by the current definition of coal as "a black or brownish black *solid* combustible mineral substance...." Webster's Third New International Dictionary 432 (1986) (emphasis added). I also note that current federal regulations define "coal" as "... combustible carbonaceous *rock,* classified as anthracite, bituminous, subbituminous, or lignite...." 25 C.F.R. § 216.101 (1993) (coal on Indian lands) (emphasis added). *Butler v. USDA,* 826 F.2d 409, 413 n. 6 (5th Cir.1987) (subsequent congressional statements, although worthy of less weight than contemporaneous ones, are entitled to careful consideration). The common meaning of "coal" has not changed in the last century.

Likewise, by way of comparison, at the time of the passage of the 1909 and 1910 statutes, "gas" was defined as "an aeriform fluid supposed to be permanently elastic ... now applied to any substance when in the elastic or aeriform state." American Dictionary of the English Language 560 (1889). Three decades later, Webster's New International Dictionary of the English Language 892 (1920) defined "gas" as "an aeriform fluid, having neither independent shape nor volume, but tending to expand indefinitely." Today, "gas" is defined in the same way—"a fluid (as air) that has neither independent shape nor volume but tends to expand indefinitely; ..." Webster's Third New International Dictionary 937 (1986). Even more to the point, an encyclopedia of the day underscores the fundamental difference between the two substances in its discussion of the commonly understood relationship between CBM gas and coal:

> Gases, consisting principally of light carburetted hydrogen or marsh gas, are often present in considerable quantity in coal in a dissolved or occluded state, and the evolution of these upon exposure to air, especially when a sudden diminution of atmospheric pressure takes place, constitutes one of the most formidable dangers that the coal miner has to encounter.

VI Encyclopaedia Britannica 575 (University Press 1910).

In a more technical vein, scientific dictionaries have defined "coal" as "[a] *solid, brittle,* more or less distinctly stratified, combustible carbonaceous *rock,* formed by partial to complete decomposition of vegetation...." *A Dictionary of Mining, Mineral, and Related Terms* 222 (1968) (emphasis added), and "a *solid* ... substance varying in color from dark-brown to black, *brittle,* combustible, and used as a fuel." A. Fay, *A Glossary of the Mining and Mineral Industry 163 (1920).* (emphasis added). Again, in a parallel but more technical view, "gas" is defined as:

> A state of matter in which cohesive forces are practically nonexistent and therefore the motion of the molecules is unrestrained. A gas has neither definite shape nor volume.

J. Henderson, *Metallurgical Dictionary* 151 (1953).

Common to all of the foregoing definitions is the description of "coal" in narrow, specific terms within which CBM gas does not fit. In contrast, "gas" is consistently defined in broad, general terms within which CBM gas clearly does fit.

My examination of these many varied sources leads to the inexorable conclusion that in 1909 and 1910, motivated by the burning need to protect and develop the nation's primary fuel resource, Congress intended to impart to the term "coal" its ordinary and common meaning as a solid rock fuel. Even without aid of reference to such definitional sources, common sense dictates that in 1909 and 1910, Congress intended "coal" to mean the solid rock substance. Hence, it is not surprising that Congress did not undertake definition of this simple term. It is also significant that the texts of the 1909 and 1910 Acts mention "coal" at least 20 times, but the term "gas" is not used once. Neither is the term "constituent" found in either Act. Under these circumstances, it would require not merely some, but herculean ingenuity to create ambiguity in the 1909 and 1910 Acts. *See Rothschild & Bro. v. United States,* 179 U.S. 463, 465, 21 S.Ct. 197, 198, 45 L.Ed. 277 (1900). *Cf. TVA v. Hill,* 437 U.S. 153, 173 n. 18, 98 S.Ct. 2279, 2291 n. 18, 57 L.Ed.2d 117 (1978) (assertions of ambiguity do not transform a clear statute into an ambiguous provision).

Notwithstanding these persuasive considerations for regarding "coal" as the solid rock mined from the ground, the Tribe argues that I give effect to a technical and scientific view that CBM gas is an inherent constituent of the coal and, thus, intended by Congress to be included in its mineral reservation of coal to the United States. As I understand it, present day scientists who are experts in the field disagree whether CBM gas is part of coal. *See e.g.* Mavor, Matthew J., *Overview of Coal Gas Reservoir Structure, Fluid Dynamics, and Completion Technology (January 15, 1993)* (CBM gas is separate and distinct from coal itself) (Amoco Exhibit 114); Levine, Jeffrey R., *A Brief Review of The Origin, Composition, and Mode of Occurrence of Natural Gas in Coal Beds (August 9, 1989)* (although scientific evidence is conflicting, there is considerable scientific merit to argument that CBM is a constituent of coal) (Amoco Exhibit 117); *Affidavit of Harry M. Marsh, Ph.D.* (CBM gas is one substance that makes up coal) (Tribe's Exhibit 2–H).

■ For two reasons, this present divergence in scientific opinion creates neither a genuine issue of material fact nor an ambiguity in the Acts. First, I must derive congressional intent as of the date of enactment. *Watt,* 462 U.S. at 62, 103 S.Ct. at 2232–33 (1983). Second, the Acts dealt with a practical subject in a practical way, and Congress intended that the term "coal" should be applied in its ordinary and popular sense. *See e.g. Burke v. Southern Pac. R.R.,* 234 U.S. 669, 678, 34 S.Ct. 907, 911, 58 L.Ed. 1527 (1914) (interpreting mineral lands statute to include petroleum as a mineral). Thus, I conclude that Congress did not intend to reserve CBM gas in the 1909 and 1910 Acts but only the solid rock coal.

**B.**

*Secondary Analysis*

■ When, as in this case, no ambiguity is found in the statute, judicial construction is ordinarily complete. *O'Connor v. U.S. Dept. of Energy,* 942 F.2d 771, 773 (10th Cir.1991). Although I do not think it necessary to resort to secondary materials or other rules to glean congressional intent, assuming the term "coal" is ambiguous in the 1909 and 1910 Acts, resort to such aids leads to the same result here. Congress did not intend to reserve CBM gas but only the solid coal.

■ Although the starting point is the language of the statute itself, I may look to extrinsic aids including legislative history and the construction placed on the statute by the agency which administers it. *Amgen, Inc. v. U.S. Int'l Trade Comm'n,* 902 F.2d 1532, 1538 (Fed.Cir.1990). Clear evidence of legislative intent prevails over other principles of statutory construction. *Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988). In interpreting language in a statute, a court may look to its object and policy. *Aulston v. United States,* 915 F.2d 584, 589 (10th Cir.1990). Remarks of the

sponsor of legislation as reported in the congressional record are an "authoritative guide" to its construction. *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–27, 102 S.Ct. 1912, 1920–21, 72 L.Ed.2d 299 (1982); *Nuclear Regulatory Comm'n v. Federal Labor Relations Authority,* 879 F.2d 1225, 1230 (4th Cir.1989). Also, the circumstances under which the legislation was enacted are relevant to its construction. *Commissioner of Internal Revenue v. Engle,* 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984); *FDIC v. Isham,* 777 F.Supp. 828, 831 (D.Colo.1991). If Congress knows how to express itself and chooses not to, its silence is probative of intent. *See In re Providence Television Ltd. Partnership,* 75 B.R. 139, 140 (N.D.Ill.1987).

1. *Legislative History*

■ Because my focus is on the intent of Congress at the time the statute was enacted, *Watt,* 462 U.S. at 62, 103 S.Ct. at 2232–33, I look to the legislative history of the Acts including, to the extent possible, what Congress then knew about the subject of its legislation. *FDIC v. Isham,* 777 F.Supp. at 831.

When the 1909 and 1910 Acts were passed, CBM gas was not known as a valuable mineral. To the contrary, it was common knowledge that CBM gas was a deadly hazard associated with coal mining. *See e.g.* J. Fassett, "Coalbed Methane—A Contumacious, Free-Spirited Bride; the Geologic Handmaiden of Coalbeds," *Energy Frontiers in the Rockies* 131 (1989). For example, caged canaries were kept in coal mines to serve as "early warning gas detectors." More dramatically, "firemen" exploded collected gas in the mine by wrapping themselves in fire-resistant blankets saturated with water. The "firemen" would then creep forward in the mine and cause an explosion by projecting a candle at the end of a long pole into an area where CBM gas had collected, then fling themselves on the ground while the flames passed overhead. Dexter S. Kimball, *Book of Popular Science* 412 The Grolier Society, Inc. 1952 (1924).

Transcripts of the extensive committee hearings and debates conducted on the pro-posed coal lands legislation illustrate congressional knowledge of the subject of coal. The House of Representatives Committee on the Public Lands on Coal Lands and Coal-Land Laws of the United States (Committee) was responsible for authoring the bills that became the 1909 and 1910 Acts. That committee had the benefit of several United States Geological Survey (USGS) reports addressing various aspects of the "coal issue." *See* e.g. George H. Ashley, *The Value of Coal Land, reprinted in, The Valuation of Public Coal Lands,* U.S.G.S. Bulletin 424, 3–47, H.R.Doc. No. 502, 61st Cong., 2d Sess. (1910); Marius R. Campbell, *Character and Use of the Yampa Coals, reprinted in, The Yampa Coal Field, Routt County, Colorado,* U.S.G.S. Bulletin 297, 82–96, H.R.Doc. No. 936, 59th Cong., 1st Sess. (1906); Marius R. Campbell, *Contributions to Economic Geology,* 1906, *Part II–Coal, Lignite, and Peat* U.S.G.S. Bulletin 316, 5–12, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1906); Rollin T. Chamberlin, *Notes on Explosive Mine Gases and Dust,* U.S.G.S. Bulletin 383, 3–67, H.R.Doc. No. 1538, 60th Cong., 2d Sess. (1909); Rollin T. Chamberlin, *Papers on the Conservation of Mineral Resources,* U.S.G.S. Bulletin 394, 1–26, H.R.Doc. No. 1554, 60th Cong., 2d Sess. (1909); Arthur J. Collier, *The Coal Resources of the Yukon, Alaska,* U.S.G.S. Bulletin 218, 1–71, H.R.Doc. No. 63, 58th Cong.2d Sess. (1903); Arthur J. Collier, *Geology and Coal Resources of the Cape Lisburne Region, Alaska,* U.S.G.S. Bulletin 278, 1–54, H.R.Doc. No. 826, 59th Cong. 1st Sess. (1906); Robert H. Fernald, *The Present Status of the Producer–Gas Power Plant in the United States, reprinted in, Contributions to Economic Geology,* 1906, Part II— *Coal, Lignite, and Peat,* U.S.G.S. Bulletin 316, 439–459, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1906); Cassius A. Fisher, *Depth and Minimum Thickness of Beds as Limiting Factors in Valuation, reprinted in, The Valuation of Public Coal Lands,* U.S.G.S. Bulletin 424, 48–75, H.R.Doc. No. 502, 61st Cong., 2d Sess. (1910); G.B. Richardson, *Natural Gas Near Salt Lake City, Utah, reprinted in, Contributions to Economic Geology,* 1904, U.S.G.S. Bulletin 260, 480–83, H.R.Doc. No. 401, 58th Cong., 3d Sess. (1905); Frank C. Schrader & Erasmus Ha-

worth, *Oil and Gas of the Independence Quadrangle, Kansas, reprinted in, Contribution to Economic Geology,* 1904, U.S.G.S. Bulletin 260, 446–458, H.R.Doc. No. 401, 58th Cong.; 3d Sess. (1905); Millar K. Shaler, *A Reconnaissance Survey of the Western Part of the Durango–Gallup Coal Field of Colorado and New Mexico, reprinted in, Contribution to Economic Geology,* 1906, *Part II– Coal, Lignite, and Peat,* U.S.G.S. Bulletin 316, 376–426, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1906) and Joseph A. Taff, *The Durango Coal District, Colorado, reprinted in, Contribution to Economic Geology,* 1906, *Part II–Coal, Lignite, and Peat,* U.S.G.S. Bulletin 316, 321–337, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1906). A pervasive theme in these reports is the focus on coal as the primary energy resource for the United States. Concern for supply and demand is evident in one report by Marius Campbell, U.S.G.S. Geologist in Charge of the coal project:

> The need for information [about coal] is imperative, for, although the amount of coal ... seems so great as to be well-nigh inexhaustible, the consumption is increasing so rapidly that already the question of a future supply of fuel is a serious one and the Government is surely justified in using every means possible to conserve the supply for the use of future generations.

Marius R. Campbell, *Contributions to Economic Geology,* 1906, *Part II–Coal, Lignite, and Peat* U.S.G.S. Bulletin 316, 5–6, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1906).

The Committee also had the benefit of Mr. Campbell's knowledge about coal when he testified in person before them. *See Hearings on Coal Lands and Coal–Land Laws of the United States Before the House Committee on Public Lands,* 59th Cong., 2d Sess. (1907). The Committee hearings transcripts show that Congress was aware of the association of CBM gas with the coal and that possibly one day the CBM gas might have value. During his testimony, Campbell speculated, "[i]t may be that gas will finally be adopted generally [for the production of power]—either gas from oil or gas from coal." *Id.* at 19. Nevertheless, no one, including Campbell, opined in written reports or congressional testimony that CBM gas was a valuable energy resource which ought to be reserved to the United States in the Acts. *See e.g.* Marius R. Campbell, *Contributions to Economic Geology, 1906, Part II–Coal, Lignite, and Peat,* U.S.G.S. Bulletin 316, 1–6, H.R.Doc. No. 823, 59th Cong., 2d Sess. (1907) and Rollin T. Chamberlin, *Notes on Explosive Mine Gases and Dust,* U.S.G.S. Bulletin 383, 1–67, H.R.Doc. No. 1538, 60th Cong., 2d Sess. (1909). *See also Hearings on Coal Lands and Coal–Land Laws of the United States Before the House Committee on Public Lands,* 59th Cong., 2d Sess. (1907). Indeed, Campbell had written "[c]oal ... is the fuel of the present, and, so far as can be see, will continue to lead ... for a long time to come." Campbell, U.S.G.S. Bulletin 316 at 6. Also, in analyzing estimates of future coal production, both Campbell and his co-author Edward W. Parker, prognosticated that water power was the future source of energy which would prolong the life of the country's coal supply. Marius R. Campbell and Edward W. Parker, *Coal Fields of the United States,* U.S.G.S. Bulletin 394, 28–29 (1909).

I next look to comments of congressional representatives themselves as evidence of what Congress meant by its use of the word "coal." *Nuclear Regulatory Comm'n v. Federal Labor Relations Authority,* 879 F.2d at 1230. Their dialogue lends clarity and meaning to the Acts in contrast with the studied and intentional ambiguity injected in current legislation by members of Congress. *See e.g.* Civil Rights Act of 1991. On February 16, 1909, Congressman Mondell of Wyoming, Chairman of the Committee and sponsor of the 1909 and 1910 Acts addressed the House of Representatives about the 1909 Act which, in his words, was written "for the protection of the rights of surface entrymen." 45 Cong. Rec. 2502 (1909). Consistent with this concern, the scope of the 1909 Act was limited to providing relief for those homesteaders who had entered lands before the lands were withdrawn because they were deemed by the U.S.G.S. to be "chiefly valuable for coal." *See* 45 Cong.Rec. 6040–41 (1910); H.R.Rep. No. 377, 61st Cong., 2d Sess., 4 (1910).

In anticipation of putting the bill to a vote, Rep. Mondell spoke at length about "the purposes of this bill." 45 Cong.Rec. 2502-04 (1909). Never once did Mondell mention or refer to CBM gas or any other "constituent" of coal. *Id.* The following exchange occurred when the specific scope of the reservation was questioned:

> Mr. STEPHENS (Texas): I desire to know the difference between this law which the gentleman proposes and the law as it now exists. What change is proposed, and why?
>
> Mr. MONDELL (Wyoming): ... It is the *first legislation before Congress providing for a limited patent,* or a patent reserving the mineral....
>
> Mr. STEPHENS: Is it not a fact that valuable minerals are reserved now to the Government?
>
> Mr. MONDELL: No; that is not true. The patent having issued, the patent carries everything in the land with it, and the Supreme Court has decided in a number of cases that if the law be complied with in good faith and the entryman makes payment and final proof, thereafter the Government is barred from raising the question as to any mineral that may occur in the land.
>
> Mr. STEPHENS: That applies also to oil and coal?
>
> Mr. MONDELL: It applies to all kinds of minerals. In other words, *the patents issued by the Government of the United States heretofore have been patents in fee.*
>
> Mr. STEPHENS: Could the gentleman better arrive at what he desires by only patenting the surface of the land and *reserving all minerals, precious and otherwise?*
>
> Mr. MONDELL: That has been discussed at some length, and *the Committee on Public Lands is not of the opinion that ought to be done.* We believe this is quite a sufficient departure from the past practice of the Government. The lands which this legislation will affect are lands which the department has claimed contain some *coals* of value.
>
> Mr. STEPHENS: Is not this a step in that direction of issuing *limited* patents?
>
> Mr. MONDELL: It is; and I trust it is as far as we will go in that direction.

45 Cong.Rec. 2504 (1909) (emphasis added).

Congress enacted the bill and on March 3, 1909 the President signed the 1909 Act into law.

The scope of the 1909 Act being limited to entries before withdrawal, concern remained as to those lands not yet entered upon for homesteading. Under the "chiefly valuable for coal" criterion, in Colorado alone "over 9,000,000 acres of land [were] withdrawn as coal lands." 45 Cong.Rec. 6050 (1910). As I noted earlier, representatives were particularly concerned that the withdrawals would retard expansion and settlement of the west. *See* H.R.Rep. No. 377, p. 3. *See also* S.Rep. No. 703, p. 2; 45 Cong.Rec. 6050 (1910). To address this concern, Congressman Mondell introduced the 1910 Act, modeled after the 1909 Act. Once again, before it was enacted, the purpose and scope of the bill was debated by the House:

> Mr. STEPHENS (Texas): Why is it necessary to preserve and reserve to the Government the *coal* and not at the same time reserve to the Government *other fuels such as gas and oil?*

45 Cong.Rec. 6044 (emphasis added).

> .    .    .    .    .
>
> Mr. MONDELL (Wyoming): ... Oil and gas present much greater difficulties [than coal], when we propose to separate the surface from the mineral,....

*Id.*

Congressional understanding of the nature of the coal is further exemplified in the following statements by Representative Ferris:

> Mr. FERRIS (Oklahoma): ... [T]his is an important matter; ... it involves every *ton of coal* in the United States....

*Id.* at 6046. (emphasis added).

> After they have prospected and before they can *mine or remove one pound or one ton of coal* ....

*Id.* (emphasis added).

> ... we have the undoubted right to surround the reservation of coal with reason-

able restraint, *so that the coal will not get away from us.*

*Id.* (emphasis added).

Now pause a moment and let me show what you have got to do in order to *remove the coal, the ultimate object to be obtained.*

*Id.* at 6048. (emphasis added).

These debates reflect Congress' clear intent in the 1909 and 1910 Acts to depart in the most narrow way possible from the historic practice of the United States to grant fee simple absolute title to homesteaders. This narrow departure took the form of granting a patent with reservation of coal but not of oil, *gas,* or any other minerals. In addition, it is significant that coal was referred to by the "ton" as a solid to be "mined" from the land. Use of such terms lends additional support to my conclusion that Congress intended to reserve only the solid rock coal. Moreover, the overriding object of Congress was to insure an adequate source of the nation's primary energy resource. That was coal as commonly understood to be a solid rock.

The treatment of coal in public lands legislation before and after the 1909 and 1910 Acts is also indicative of Congressional intent underlying those Acts. *See Aulston,* at 589. Consistent with its role as the nation's primary energy resource, coal was treated separately from all other minerals in the legislative scheme of the 19th century. In 1864, Congress passed legislation aimed at promoting expansion and settlement of the west by authorizing entry on coal lands. 13 Stat. 343 (1864). Upon fulfilling certain conditions, including payment of not less than either $10 or $20 per acre depending on the distance of the land from a railroad, an entryman would receive a fee simple absolute patent. *See e.g.* 17 Stat. 607 (1873); 13 Stat. 529 (1865); 13 Stat. 343 (1864). Soon thereafter, Congress also enacted legislation addressing the method by which entrymen could obtain patents to lands valuable for all types of mineral deposits other than coal. 14 Stat. 251 (1866) (similar provision codified as 30 U.S.C. § 22). *See also* 17 Stat. 91 (1872) (codified as 30 U.S.C. § 26); 16 Stat. 217 (1870).

A chronological examination of public lands acts from 1864 to the present, highlights a conscious legislative intent to move methodically from issuance of fee simple absolute patents, to issuance of patents with a narrow mineral reservation, and finally to the issuance of patents with the broadest reservation possible of valuable mineral rights in the government. In its initial departure from issuing unlimited patents, Congress passed the 1909 and 1910 Acts which reserved a single mineral—coal. The next legislative reservation of minerals occurred in the Act of 1914, 30 U.S.C. § 121. There, Congress broadened the scope of mineral reservation by enumerating specific minerals to be reserved—"phosphate, nitrate, potash, oil, *gas,* or asphaltic minerals." (emphasis added).

During congressional proceedings on the 1914 Act, Rep. Mondell, sponsor of the 1909 and 1910 Acts, spoke once more about the scope of mineral reservations in the United States:

Mr. MANN: Under such circumstances, where the land has been withdrawn for [asphaltic minerals] and we give a surface title, why should not the Government reserve *all* of the minerals under the surface?

.     .     .     .     .

Mr. MONDELL: Mr. Speaker, the gentleman's suggestion relates to a general mineral reservation.... The moment you *depart from the kind of reservation that we have heretofore provided for in the case of coal, and which we are now extending to these other minerals*-the moment you depart from that *theory of the reservation of those minerals only for which the land is withdrawn*—you must logically go to the extreme of withholding all minerals.

Mr. MANN: Why not do that?

Mr. MONDELL: That is a pretty large question, and it has been argued here several times....

.     .     .     .     .

Mr. MONDELL: Mr. Speaker, the monarchical theory is to reserve all minerals to the crown, upon the theory that the mere subject is not entitled to anything except the soil that he stirs. It [reservation of minerals to the government] is ... a relic

of monarchical government, of peonage, if you please. . . .

Our fathers departed from that plan. I do not think we should dispose of lands in fee simple for agricultural purposes that do unquestionably or probably contain *valuable minerals,* and we are reserving in such lands the minerals which they are believed to contain . . . and it seems to me that is going quite far enough, and that it would not be wise to go further. *It is a rather radical departure from our past practice to [now] make a general reservation of all of the minerals. It should not be done. But if you are going to depart from the principle in this bill, which is the principle in the coal bill which passed a couple of years ago, there is no middle ground. It is either a reservation of . . . minerals which the lands are believed to contain or it is a reservation of all minerals. . . .*

51 Cong.Rec. 10493–94 (1914) (emphasis added).

Two years later, Congress enacted the Homestead Act of 1916, 43 U.S.C. § 299, which contained the broadest mineral reservation to date—"all the coal and other minerals."

What emerges from this abundant legislative history is a clear expression of congressional intent to move from its initial policy of no mineral reservation, to a progressive widening of the scope of its mineral reservation from the most narrow reservation to the broadest possible. Comparison of the terms of the 1864 Coal Lands Act, the 1909 and 1910 Acts, the 1914 Act, and the Homestead Act of 1916 demonstrates that Congress knew how to reserve specific minerals when it chose or to make a broad reservation of minerals when it chose. Hence, overwhelming legislative history leads to the inescapable conclusion that when the 1909 and 1910 Acts were passed, Congress did not intend to include CBM gas in the reservation of the "coal" to the United States.

■ In the face of overwhelming legislative intent that Congress did not intend to reserve CBM gas in the 1909 and 1910 Acts, the Tribe relies on two well-established principles in advancing its claim that CBM gas is part of the reserved coal. First, nothing passes by implication in a public land grant and, second, such grants should be interpreted in favor of the government. *Andrus v. Charlestone Stone Products Co., Inc.,* 436 U.S. 604, 617, 98 S.Ct. 2002, 2009–10, 56 L.Ed.2d 570 (1978). The Tribe overlooks, however, an equally well established exception to these rules. Public land grants "are not to be so construed as to defeat the intent of the legislature, or to withhold what is given either expressly or by necessary or fair implication." *Leo Sheep Co. v. United States,* 440 U.S. 668, 682–83, 99 S.Ct. 1403, 1411, 59 L.Ed.2d 677 (1979), *quoting United States v. Denver & Rio Grand R.R.,* 150 U.S. 1, 14, 14 S.Ct. 11, 45, 37 L.Ed. 975 (1893). In this case, the intent of Congress is clear, or at the very least, it is fair to imply, that the reservation of "coal" did not include CBM gas.

Next, the Tribe asserts the general rule applied in Indian matters that whenever doubt or ambiguity exists in federal Indian statutes or regulations, such doubt is resolved in favor of the tribes. *See, e.g., Oneida County, N.Y. v. Oneida Indian Nation of N.Y.,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985); *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* 467 U.S. 138, 149, 104 S.Ct. 2267, 2274–75, 81 L.Ed.2d 113 (1984); *Ramah Navajo School Bd. Inc. v. Bureau of Revenue of N.M.,* 458 U.S. 832, 838, 102 S.Ct. 3394, 3398–99, 73 L.Ed.2d 1174 (1982). However, the 1909 and 1910 Acts are not federal Indian laws. Rather, they are public land laws. While the Acts arguably may now affect Indian lands, the Acts were not passed for tribal benefit. Thus, this rule is inapposite in this case.

2.

*1981 Solicitor General's Opinion*

I also look to the effect of an opinion issued in 1981 by the Solicitor General to the Secretary of the Interior addressing the issue of "who owns the coalbed gas in land where the coal or oil and gas was reserved to the U.S. . . . " *Ownership Of And Right To Extract Coalbed Gas in Federal Coal Deposits,* 88 I.D. 538, 539 (1981). Although the Solicitor General did not specifically address

minerals on Tribal lands, the opinion concluded that "the reservation of coal to the United States in the Act of Mar. 3, 1909 and the Act of June 22, 1910, 30 U.S.C. §§ 81, 83–85 (1976), did not include the coalbed gas found in the reserved coal." *Ownership*, 88 I.D. at 540.

■ *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) controls the analysis for evaluating the weight to be given the Solicitor General's decision:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. (fn omitted). Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. (fn omitted).

*Chevron*, at 842–43, 104 S.Ct. at 2781–82. *See also Sullivan v. Everhart*, 494 U.S. 83, 88–89, 110 S.Ct. 960, 963–65, 108 L.Ed.2d 72 (1990); *Exxon Corp. v. Lujan*, 970 F.2d 757, 759 (10th Cir.1992). In determining whether the agency's construction of the statute is permissible, a reviewing court need not conclude that the agency's construction is the only one it could have adopted or even that the construction is the one the court would have reached if it were initially deciding the issue. *See e.g. Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Rather, the agency's decision is given controlling weight unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. The Acts of 1909 and 1910 neither mention CBM gas nor contain a definition of "coal." Thus, under the *Chevron* analysis I turn to whether the Solicitor General's opinion is based on a permissible construction of these statutes.

In a well-reasoned opinion, the Solicitor General thoroughly and meticulously considered the historical context surrounding the passage of the 1909 and 1910 Acts, the legislative history of the Acts, and measured the treatment of "coal" on the one hand and "gas" on the other in subsequent federal legislation and regulations. The Solicitor General concluded that CBM gas was not part of the coal estate reserved to the United States. *Ownership*, at 540, 549. I independently reach the same conclusion. It follows then that in my view the Solicitor General's conclusion that Congress' use of the term "coal" did not include CBM gas is not "arbitrary, capricious or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.

To summarize, I conclude Congress intended to give the term "coal" in the 1909 and 1910 Acts its common ordinary meaning. Congress intended "coal" to mean the solid black rock mineral contained in the ground and not CBM gas. Assuming *arguendo* the term "coal" renders the Acts ambiguous, I conclude that at the time of their passage, there was no intent on the part of Congress to include CBM gas in its reservation of coal to the United States in the Acts. Furthermore, and in any event, I grant deference to the 1981 Solicitor General's opinion that Congress' use of the term coal does not include CBM gas. In short, all modes of legislative analysis of congressional intent point but one way. CBM gas was not reserved to the United States in the Coal Lands Acts of 1909 and 1910. CBM gas, therefore, was conveyed by patents issued to the lands in question and, thus, was not restored to the Tribe in 1938 under the IRA.

## IV.

### Common Defenses

As stated at the outset, in addition to the central issue of ownership I also certified the defendant class to address application to the ownership question of certain defenses said to be common to the defendant class. This question has also been exhaustively briefed and argued including application of the Nonintercourse Act, 25 U.S.C. § 174 and allocation of Rule 56 burdens under 25 U.S.C. § 194. Having held for the class on the question of ownership, however, I need not address further the application of the com-

mon defenses to the ownership question or the application of the Nonintercourse Act.

## V.

### *Federal Defendants*

Also before the court is the federal defendants' motion to dismiss or alternatively; for summary judgment addressed to the Tribe's "Eleventh Claim for Relief":

74. The Federal Defendants have breached their fiduciary duties to the Tribe by permitting or acquiescing in the extraction of substances from the coalbeds or strata, or the extraction of constituent, inherent, and integral components of the Tribe's Reserved and Restored Coal and the Subject Lands without the consent of the Tribe and in violation of various federal laws including, but not limited to, 25 U.S.C. § 177, 25 U.S.C. § 396a, 25 U.S.C. § 2101 U.S. et seq., and 25 U.S.C. § 476.

Plaintiff's First Amended Complaint.

The sole premise argued by the federal defendants in support of their motion for summary judgment is that a claim based on breach of a trust duty to manage the Tribe's CBM gas resource must fail because the Tribe does not own the CBM gas. I agree. Based on my ruling that, as a matter of law, the Tribe does not own the CBM gas, it follows *a priori* that the federal defendants have no fiduciary duty to the Tribe to manage the CBM gas for the benefit of the Tribe. Therefore, I will grant the federal defendants' motion for summary judgment on the issue of breach of fiduciary duty to manage the CBM gas as a tribal resource.

In support of their motion to dismiss, the federal defendants argue that the Tribe's claim for relief against the United States for breach of fiduciary duty is barred by the statute of limitations contained in 28 U.S.C. § 2401(a). In turn, the nonfederal defendants argue that if this action is dismissed against the federal defendants it must also be dismissed against them because the federal defendants are indispensable under Fed. R.Civ.P. 19. Based on my ruling on the ownership issue, however, I do not reach either issue.

The Tribe's Eleventh Claim against the federal defendants is broader than the issue of breach of fiduciary duty based on CBM gas addressed in this opinion and order. For example, it may encompass some duty to ensure mitigation of damage to the coalbed strata caused by CBM gas extraction. Because the federal defendants' motion for summary judgment addressed only its duty stemming from the Tribe's ownership claim, other issues concerning these defendants remain for a later day.

Accordingly, it is ORDERED that

1. Amoco's motion for summary judgment is GRANTED on the question of ownership of CBM gas and judgment shall enter in favor of the defendant class against the plaintiff Tribe upon its claim for declaration of ownership of CBM gas in the lands at issue;

2. Amoco's motion for summary judgment on the class action defenses is DENIED as moot based on the conclusion that the Tribe does not own the CBM gas;

3. the Tribe's motion for summary judgment is DENIED;

4. federal defendants' motion for summary judgment is GRANTED but only on the issue of breach of fiduciary duty for failure to manage the CBM gas;

5. a further scheduling and status hearing will be held on November 4, 1994 at 3:00 o'clock p.m. at which time I will consider Fed.R.Civ.P. 54(b) certification. Ten days in advance of the hearing, the parties shall submit an agreed proposed form of Rule 54(b) order together with proposed form of judgment to be certified. Any areas of disagreement in the proposed forms are to be specified along with reason therefor, and supplemented by suggested alternative language.

Date: September 13, 1994